**PLAINTIFFS IN ALL WINSTAR–
RELATED CASES AT THE
COURT, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 90–8 C.**

United States Court of Federal Claims.

May 20, 1999.

**4**

Daniel F. Goldstein, Baltimore, MD, and John C. Millian, Washington, DC, counsel to Plaintiffs' Select Committee on FDIC Intervention, for affected plaintiffs.

John V. Thomas, Associate General Counsel, for Federal Deposit Insurance Corporation. Jon A. Stewart, Richard M. Schwartz and Gregory A. Smith, Washington, DC, and Jeffrey D. Herschman, Baltimore, MD, of counsel.

Jeanne E. Davidson, with whom were Assistant Attorney General Frank W. Hunger and David M. Cohen, Washington, DC, for defendant. Harold D. Lester, Jr., Robert Steinbuch and Ho Sik Shin, Department of Justice, Washington, DC, of counsel.

## OPINION ON ISSUES RELATED TO FDIC INTERVENTION

TURNER, Judge.[1]

The Federal Deposit Insurance Corporation (FDIC), by motion filed on November 12, 1996, sought to intervene as party-plaintiff and substitute itself as sole party-plaintiff in 43 "Winstar-related" cases [2] which involved failed thrift institutions. The motion was vigorously opposed by existing plaintiffs

---

1. By order of the Chief Judge dated October 7, 1996, the undersigned was appointed as the Issue Judge for "consideration and resolution" of issues related to proposed intervention of FDIC in cases involving failed thrifts.

2. The motion was originally directed to 46 of such "Winstar related" cases. During the course of briefing issues raised by the motion, the precise number of cases to be directly controlled by rulings on the motion was reduced to 43. In seven of these 43 cases, identified by asterisks in the appendix to the attachment to this opinion, a failed thrift had been named as a party-plaintiff. In seven separate motions, FDIC sought to be substituted for the failed thrifts; these motions were granted by an order dated March 11, 1997. Consequently, the portion of this opinion concerning FDIC intervention actually applies only to the remaining 36 cases, but the portion of the opinion explaining denial of FDIC's request to exclude all other plaintiffs applies to all of the 43 cases.

in the affected cases. Issues raised by the motion were extensively briefed and were argued on January 28 and 30, 1997.

At the conclusion of oral argument on January 30, 1997, "tentative" rulings were made, subject to refinement after consultation with the parties. A definitive order dated March 14, 1997 granted the motion to the extent that FDIC sought intervention as a party-plaintiff in the 43 cases involving failed thrifts, but denied the motion to the extent that FDIC sought to be substituted for (and to the exclusion of) all shareholder plaintiffs in those 43 cases. A copy of the March 14, 1997 order is attached.

This opinion is to more fully state the rationale for the rulings in said order.

## I

FDIC sought leave to intervene in each case in either of two capacities, to wit, as duly appointed receiver of a failed thrift or as the statutory manager of the FSLIC Resolution Fund [3] (and consequently the holder of legal title to all undistributed assets, including claims, of a failed thrift).

The critical, pivotal fact with respect to the intervention issue is that FDIC, as receiver or fund manager, is the holder of legal title to the claims formerly held by the thrifts.[4]

The powers and duties of FDIC as receiver of an insured institution are set forth in 12 U.S.C. § 1821(d)(2). That statute clearly provides that FDIC as receiver, by operation of law, succeeds to "all rights, titles, powers, and privileges of the [thrift] ... and of any stockholder ... of such institution with respect to the institution and the assets of the institution ..." and may "collect all obligations and money due the institution." 12 U.S.C. § 1821(d)(2)(A)(i) & (B)(ii).

The powers and duties of FDIC as manager of the FSLIC Resolution Fund are identical to those of a receiver as the result of incorporation of those powers in 12 U.S.C. § 1823(d)(3). That statute provides that assets of a receivership acquired by FDIC in its capacity as an insurance corporation remain impressed with their character as receivership assets and that, consequently, FDIC has the same rights, powers and obligations with respect to such assets as it had (or would have) as a receiver.

To illustrate, 12 U.S.C. § 1823(d)(3)(A) states that "with respect to any asset acquired" from a receivership, FDIC "shall have all of the rights, powers, privileges, and authorities of ... [FDIC] as receiver under [12 U.S.C. § 1821]." Title 12 U.S.C. § 1823(d)(3)(C) provides: "In exercising any [such] right, power, privilege, or authority ..., [FDIC] ... shall continue to be subject to the fiduciary duties and obligations of the ... [FDIC] as receiver to claimants against the insured ... institution in receivership."

Among the obligations imposed upon receivers is the requirement to distribute assets in a set order of priorities. Title 12 U.S.C. § 1821(d)(11)(A), dealing with the priority for distribution of "amounts realized from the liquidation or other resolution of any insured depository institution" by any receiver, expressly states that except for "secured claims to the extent of any such security," the first priority consists of expenses of administration, the second priority is the deposit liability, third and forth priorities consist of claims of creditors other than depositors, and the fifth and last priority is for shareholders.

In combination, these statutory provisions establish that FDIC, as receiver or FSLIC

---

**3.** See 12 U.S.C. § 1821a concerning the establishment of the FSLIC Resolution Fund. Title 12 U.S.C. § 1821a(a) provides that the fund shall be managed by FDIC and that it shall be "separately maintained and not commingled."

**4.** In addressing FDIC's motion, no effort was made to resolve factually any disputes concerning title to any claims, whether asserted by FDIC or the original plaintiffs. We accepted FDIC's assertions that it was the receiver or fund manager with respect to each thrift affected by the motion and left for resolution in individual cases any dispute over whether FDIC actually was the duly appointed receiver or whether there was any defect in its title to a particular thrift's claim. See, e.g., Parts IV–B and IV–C of the March 14, 1997 attached to this opinion. This approach is analogous to the "well-pleaded complaint" rule applied in addressing jurisdictional issues. See Total Medical Management, Inc. v. United States, 29 Fed.Cl. 296, 298–99 (1993), rev'd on other grounds, 104 F.3d 1314 (Fed.Cir.1997).

**6**

Resolution Fund manager, holds legal title to the assets (including claims) formerly owned by the failed thrifts and that any recovery based on the assertion of a claim of any such thrift must be distributed pursuant to the statutory order of priorities.

## II

RCFC 24, which is essentially identical to Rule 24 of the Federal Rules of Civil Procedure, provides:

> (a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
> (b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

FDIC's status as holder of legal title to the claims of the failed thrifts and its obligations concerning distribution of the proceeds of such claims certainly qualify for intervention of right unless it could be demonstrated that its "interest is adequately protected by existing parties." RCFC 24(a).

Even if FDIC's interests were "adequately protected by existing parties," its claims and the "main action[s]" plainly have "a question of law or fact in common," RCFC 24(b), qualifying FDIC for permissive intervention. Actually, the claims asserted by FDIC are the identical claims asserted by the shareholder plaintiffs to the extent they are asserting derivatively the claims of the failed thrifts. A court's discretion to grant permissive intervention should be exercised only after considering whether intervention would "unduly delay or prejudice the adjudication of the rights of the original parties."

With respect to intervention of right, we concluded that the FDIC's interests were not adequately protected by the existing parties. The voluminous briefing and lengthy argument concerning FDIC's motion revealed that many shareholder plaintiffs assumed that without FDIC's presence in the case, they will be entitled to payment from liquidation of the thrift's claims ahead of creditors.

With respect to alternative permissive intervention, we concluded that FDIC's intervention would not unduly delay or prejudice the genuine rights of the original, timely plaintiffs who kept the thrift's claims (as well as their own direct, individual claims) alive over a period of years.

Concerning possible prejudice to legitimate rights, we concluded that it was wholly lacking. Concerning possible delay in the adjudication of rights, we concluded that any delay which might result was insignificant when balanced against the desirability of having the holder of legal title to the thrift's claims actively participate in the litigation.

FDIC, as a separate federal agency, was not dilatory in submitting its motion to intervene. It was first in a position to act in these cases in January 1996 upon dissolution of the Resolution Trust Corporation (on December 31, 1995) and the transfer by operation of law of all RTC's assets to FDIC. 12 U.S.C. § 1441a(m)(1) & (2). More significantly concerning possible delay, virtually all cases affected by FDIC's intervention motion had been suspended over an extended period awaiting finality of the litigation culminating in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), decided on July 1, 1996. (The *Winstar* case itself, Fed.Cl. No. 90–8, is one of the cases affected by FDIC's motion.) If that case had been decided in the government's favor, there would have been no reason for FDIC to seek intervention to assert its recently acquired claims. Its intervention motion was filed within five months of the Supreme Court's decision.

## III

■ The one objection to intervention raised by plaintiffs worth extended discus-

sion is the "case or controversy" problem resulting from two undeniable facts. One is that upon intervention by the FDIC, the same government agency, in practical effect, would assert or assist in asserting interests on both sides of each case. The other fact is that a predecessor to FDIC, the Federal Savings and Loan Insurance Corporation, made the promises to the thrifts and their investors, later breached by the government, on which damage claims in these cases are premised. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Both factors created a facial issue of whether, upon intervention, FDIC would be suing itself, resulting in a situation lacking justiciability.

We concluded that a genuine controversy exists between FDIC as a receiver (or as fund manager) and the government, and that FDIC's status as a federal agency does not necessarily (and does not in these cases) foreclose its capacity to be a party plaintiff in litigation against the United States government. To the extent FDIC is the client agency defended by the Department of Justice and assisting DOJ in defense of the cases, such defense and assistance is made in FDIC's capacity as an insurance corporation and bank regulator. Congress has thrust, as a minimum, dual roles upon FDIC, and it is not free to neglect either of them. It should, of course, to the maximum possible extent discharge its conflicting duties in a manner that keeps the interests separated and we are persuaded that it has done so.[5]

In its capacity as receiver (or as fund manager), FDIC is obligated to marshal the assets of the failed thrifts for the benefit of the thrifts' creditors and shareholders. In this capacity it is acting on behalf of the insured institutions and their creditors and shareholders and is under an obligation to assert claims of the institutions even against the United States. FDIC, as receiver, is authorized by statute to "take over the assets of . . . the insured depository institution," 12 U.S.C. § 1821(d)(2)(B)(i), and to "collect all obligations and money due the institution." 12 U.S.C. § 1821(d)(2)(B)(ii). In addition, FDIC may "perform all functions of the institution in the name of the institution . . . ." 12 U.S.C. § 1821(d)(2)(B)(iii).

In adjudicating the legal position of FDIC in this context, the Supreme Court has stated that "the FDIC as receiver steps into the shoes of the failed S & L, obtaining the rights of the insured depository institution that existed prior to receivership." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (citing 12 U.S.C. § 1821(d)(2)(A)(i)) (internal quotation marks and citation omitted). This statement applies in these cases in which FDIC is asserting the claims of the failed thrifts against the United States for alleged breach of contract. The Court also specifically noted, *O'Melveny & Myers*, 512 U.S. at 85, 114 S.Ct. 2048, that when acting as receiver, "the FDIC is not the United States, and even if it were we would [not] . . . assume that it was asserting its *own* rights rather than, as receiver, the rights of [the failed thrift]." Therefore, any inquiry concerning the existence of "case or controversy" should be conducted as if this litigation were between the failed thrifts and the United States.

The Supreme Court had occasion 50 years ago to decide whether a law suit may be maintained between an independent federal governmental agency and the United States in *United States v. Interstate Commerce Commission*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). During World War II, the rates of many railroads included a fee for "wharfage" (handling services in moving goods between railroad cars and piers). *Id.*

---

**5.** A "firewall" has been established within the legal department of FDIC so that the lawyers working with the Justice Department in defense of these cases (and thus representing the interests of the successor to the former regulators who negotiated the contracts in issue and the interests of the insurance corporation) do not overlap with the lawyers representing the interests of the failed thrifts. FDIC Br. (11/12/96) at 11. See also Memorandum to All Employees from William F. Krooner, III, General Counsel of FDIC, regarding the Separation of the DOJ Group and the Receivership Group, July 23, 1996, cited by Plaintiffs in Appendix # 6 to Plaintiffs Select Committee Br. filed December 2, 1996, and Tr. (1/30/97) at 145–52. Insofar as this litigation is concerned, the two attorney groups are as separate as if they worked for different law firms.

at 428, 69 S.Ct. 1410. The U.S. War Department shipped a substantial amount of goods overseas and, in the process, transported goods by rail to piers in Norfolk, Virginia. The United States took over the piers and performed the wharfage services itself, even though it continued to pay to the railroads rates which allegedly included such services. *Id.*

The United States filed a complaint with the ICC for refund of the portion of the railroad rates attributable to wharfage services, but relief was denied. *Id.* at 429, 69 S.Ct. 1410. The United States then filed suit in a federal trial court to set aside the Commission's order, naming the ICC as a defendant. *United States v. Interstate Commerce Commission,* 78 F.Supp. 580 (D.D.C.1948). Moreover, pursuant to a statutory requirement that any action to set aside a ‹Commission order be brought against the United States, the United States was also made a defendant. *Id.* at 583. Indeed, the same Assistant Attorney General signed both the complaint and the answer to the complaint. *Id.*

The trial court dismissed the suit on the theory that the government could not sue itself. *Id.* at 584. The Supreme Court reversed, holding that "the established principle that a person cannot create a justiciable controversy against himself has no application" in that case. *ICC,* 337 U.S. at 431, 69 S.Ct. 1410.

The case stands for the proposition that the existence of conflicting interests between individuals or groups, rather than the names of the parties, determines whether there is a justiciable controversy. The Court emphasized that we "must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented." *Id.* at 430, 69 S.Ct. 1410. In that case, the Court recognized that "[w]hile this case is United States v. United States, et al., it involves controversies of a type which are traditionally justiciable." *Id.*

The government, like any shipper performing its own wharfage services, was entitled to petition the ICC for a refund of wharfage fees paid to the railroad. Thus, the lawsuit there was "a step in proceedings to settle who is legally entitled to sums of money, the Government or the railroads." *Id.* Likewise, in this case, FDIC as receiver of the failed thrifts has a duty to join in these cases (or in some manner pursue the thrifts' claims by litigation) in order to recover any damages owed by the government to the failed thrifts.

In *ICC,* 337 U.S. at 431, 69 S.Ct. 1410, the government, as a shipper-plaintiff, charged that the ICC order was illegal, and that charge alone was held by the Supreme Court to be "enough to present a justiciable controversy." *Id.* Similarly, the FDIC has accused the government of breaching contracts it entered into with the thrifts; that charge alone is enough to satisfy the case or controversy requirement.

Further, in *ICC,* the Supreme Court recognized the anomaly of "having the Attorney General appear on both sides of the same controversy." *ICC,* 337 U.S. at 431, 69 S.Ct. 1410. But, the Court emphasized that "[h]owever anomalous, this situation results from the statutes defining the Attorney General's duties." *Id.* (citing the Interstate Commerce Act's requirement that the Attorney General appear for the Government as a statutory defendant, at the same time, the Attorney General was obliged under a different statute to sue on behalf of the United States).

Just as, in *ICC,* the justiciable controversy was really a dispute over rates between the federal government as a shipper and railroads which carried government-owned freight, the appearance of FDIC in these cases as receiver or fund manager merely continues the existing controversy between those asserting claims of the failed thrifts, on the one hand, and the United States government, as the entity found in *Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964, to have breached contracts with certain thrifts, on the other.

In sum, we concluded that FDIC possesses standing to sue the government as receiver (or fund manager) for failed thrifts and that its intervention as plaintiff would not result in an absence of "case or controversy."

## IV

### A

FDIC sought not only to be allowed to participate in these cases, it further sought to exclude the shareholder plaintiffs from any participation, at least to the extent that other plaintiffs are asserting claims which belonged to a now-defunct thrift. We concluded that in the circumstances of the cases affected by FDIC's motion (i.e., attempted collection of assets as part of the liquidation and complete distribution of assets of failed thrifts), the original plaintiffs, even as derivative shareholders, have standing to and otherwise should remain in the litigation.

FDIC argued that it should be substituted for all shareholder plaintiffs in these 43 cases. It claimed that it is the legal owner of all the claims pleaded by the shareholder plaintiffs and asserted that the shareholder plaintiffs were suing derivatively on behalf of the failed thrifts. (As discussed earlier, we assumed for purposes of resolving FDIC's motion that, as receiver or as manager of the FSLIC Resolution Fund, it does hold title to any claim formerly owned by one of the failed thrifts. Any issues related to validity of FDIC's title are for resolution in individual cases.)

Even if the shareholders pleaded direct claims for breach of contract between the government and themselves, FDIC argued that those direct claims were derivative claims in disguise. FDIC stated that the injuries claimed to be suffered by the shareholder plaintiffs were in fact injuries to the thrifts. It said that as receiver for the thrifts or as the manager of the FSLIC Resolution Fund, it was entitled to be substituted for all the shareholder plaintiffs and to take over all their claims.

Shareholder plaintiffs objected, arguing that they have alleged direct contract claims [6] based on agreements between the shareholder plaintiffs and the government concerning treatment of the goodwill of the thrifts. Thus, the shareholder plaintiffs argued that they were the proper parties to bring those direct claims, and FDIC, as a representative of the thrifts, should not, and cannot be allowed to usurp those personal, individual rights of the direct claimants.

### B

Undoubtedly, to the extent shareholder plaintiffs assert claims of the failed thrifts, they are asserting derivative claims. However, many shareholder plaintiffs alleged direct individual contract and constitutional claims in addition to derivative claims. As defendant states in its brief filed on January 23, 1997, most of the shareholder plaintiffs alleged direct claims in the complaints. See Table attached to Def.Br. (1/23/97). All shareholder plaintiffs alleged constitutional claims against the government. PSC Br. (11/25/96) at 4.

FDIC argued that those shareholders who 1) were not signatories to a written Assistance Agreement, 2) whose signed contract did not contain the key Goodwill terms, or 3) who did not make any capital contribution to the thrift, cannot have a valid direct breach of contract claim. However, it is not appropriate for the undersigned issue judge to determine at this juncture the adequacy of shareholder plaintiffs' direct individual claims. Such determinations are best left to the trial judge or motions judge in an individual case in response to an appropriate dispositive motion after FDIC has filed its complaint. At this juncture, it is sufficient that such shareholders have alleged individual, direct contract claims against the government.

FDIC acknowledged that "the Court may conclude that for at least some categories of the asserted claims the only way to sort out whether each Shareholder Plaintiff actually has a direct claim, rather than a disguised derivative claim, is to brief that question on a case-by-case basis." FDIC Br. (12/23/96) at 37. The government also concurred that the ownership of the alleged direct claims should be determined through an examination of the

---

6. The direct claims alleged by the shareholder plaintiffs are breach of contract, frustration of purpose and/or Fifth Amendment takings claims.

PSC Br. (11/25/96) at 1. In those direct claims, shareholder plaintiffs seek to recover damages, restitution and/or just compensation.

facts of each alleged direct claim. Def.Br. (1/23/97) at 21.

We thus held that FDIC will not be substituted at this juncture for those shareholder plaintiffs who alleged direct contract or takings claims. However, as indicated, this ruling does not foreclose dispositive motions concerning such claims in the individual cases.

## C

■ FDIC asserted that some shareholder plaintiffs alleged only pure "derivative claims" and that it should have been substituted for those shareholders since they are suing on a claim owned by FDIC as receiver or fund manager. FDIC took the position that since a derivative action by definition derives from a cause of action belonging to a corporation and that any recovery would go to the corporation, the shareholders should be excluded from participation now that the receiver has intervened on behalf of the corporation.

In a typical, traditional derivative suit, the entire recovery would go to the corporation, and its board of directors would be free to spend the recovery as it pleased, not necessarily as a distribution to shareholders. For example, the management of a healthy corporation might use the total recovery for business expansion or merely hold it for un-anticipated needs. Derivative shareholder plaintiffs usually have no assurance that they will receive anything from a recovery (beyond possible increase in the value of their stock).

But in the case at bar, the factual situation is significantly different. The critical factor here is that the corporation, the thrift, has been or will be liquidated. Here, the shareholders of each failed thrift will be solely entitled to any surplus remaining after the thrift's creditors and the expenses of administration have been paid. *See* 12 U.S.C. § 1821(d)(11)(A). Thus, the shareholders have a direct, vested interest in such excess portion of any recovery.[7] This is the rationale applied by the Federal Circuit in two cases that have permitted shareholders to assert claims of failed financial institutions in the liquidation context.

In *California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed.Cir.), *cert. denied*, 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992), the sole shareholder of a failed thrift (CHS) sued the government in this court alleging a Fifth Amendment taking of the thrift's property. *Id.* at 956. The government asserted that CH lacked standing to sue either individually or derivatively on behalf of the failed thrift. The Federal Circuit rejected this argument, stating that

---

7. The former United States Court of Claims once held that shareholder derivative actions would not be addressed because that court had not adopted a specific rule dealing with such derivative actions. *Whited v. United States*, 230 Ct.Cl. 963, 965, 1982 WL 1408, *cert. denied*, 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982). Contrary to common assumption, *see, e.g., Branch v. United States*, 69 F.3d 1571 (Fed.Cir.1995); *First Hartford Corp. Pension Plan & Trust v. United States*, 42 Fed.Cl. 599, 607–08 (1998), the *Whited* opinion did *not* hold that the Court of Claims lacked jurisdiction to address derivative actions. Surely that court was not suggesting that it could itself create jurisdiction by adopting a rule. In fact, the Court of Claims specifically acknowledged that district courts could address the action under the Little Tucker Act if the claim were reduced to less than $10,000. 230 Ct.Cl. at 965. We conclude that the Court of Claims considered the issue one of standing rather than one involving the court's jurisdiction over money claims based on contract or legislation.

More recently, this court held that even though there is no specific rule in this court authorizing shareholder derivative actions, that does not jurisdictionally bar this court from entertaining shareholder derivative suits against the United States. *Suess v. United States*, 33 Fed.Cl. 89, 97 (1995). Indeed, to conclude otherwise would imply that we can create our own jurisdiction merely by adopting a rule. *See also U.S. Polycon Corp. v. United States*, 43 Fed.Cl. 11, 13 (1999) (stating that "although [o]n points of substantive law, Court of Claims precedent is controlling, binding authority in our cases ..., ·Court of Claims decisions regarding its rules of procedure are not binding upon this court in the interpretation of our rules promulgated under our own statutory authorization ..."). *But see First Hartford Corp. Pension Plan & Trust*, 42 Fed.Cl. at 607–08.

Here, we have no occasion to express an opinion whether "pure" shareholder derivative suits are proper in this court, since, as explained in text, the derivative shareholder plaintiffs in these cases have a direct, vested, individual right to the portion of any recoveries that exceed, in a given case, the total of creditors claims and expenses of administration.

CHS's complaint "could be construed as filed by a sole shareholder on behalf of a corporation alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest pursuant to 12 U.S.C. § 1821(d)(11)(B) ...." *Id.* at 957, n. 2. Thus, the court upheld CHS's standing to sue, and declined to decide whether this court "is [otherwise] authorized to entertain a shareholder derivative suit." *Id.*

The Federal Circuit reached a similar result in *Branch v. United States*, 69 F.3d 1571 (Fed.Cir.1995). There, the bankruptcy trustee of the sole owner (a holding company) of the Maine National Bank, which had been seized by FDIC, *id.* at 1574, sued the government, asserting the failed bank's claim for an alleged taking, describing the suit as a shareholder derivative action on behalf of the bank. *Id.* The Federal Circuit found that a judgment favorable to the plaintiff in that case would increase the distributable assets of the bank and could result in a surplus that would benefit the bank's owner's shareholders. *Id.* at 1575. The court held that this court could properly address the trustee's suit, because "the complaint could be construed 'as filed by a sole shareholder on behalf of a corporation alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest.'" *Id.* (quoting *California Housing Securities, Inc.*, 959 F.2d at 957, n. 2).

We concluded that shareholder plaintiffs suing derivatively in the cases affected by FDIC's motion (all of which involve liquidations of failed thrifts) have a direct, vested interest in the surplus of potential recoveries and, therefore, have standing to remain as plaintiffs in these actions notwithstanding FDIC's appearance on behalf of the failed thrifts.[8]

The government argued that *Branch* and *California Housing Securities* can be distinguished because each of those cases was

brought by a single shareholder of a failed financial institution, whereas in the instant case there are, typically, multiple shareholders owning each failed thrift. This is a distinction without a difference. The multiple shareholders in each of these cases could easily form one holding company, thus satisfying the "sole shareholder" requirement. This useless maneuver would not resolve the issue whether the shareholders have standing as a result of their direct interest in surplusage. The Federal Circuit's mention in both *Branch* and *California Housing Securities* that the plaintiff was a sole shareholder was likely merely a recitation of the facts of those cases, not a critical part of its rationale. Plainly, the court did not emphasize this aspect of either case.

The liquidation context of these cases provides another factor illustrating the wisdom of the Federal Circuit's holdings permitting similarly situated shareholders to assert derivative claims. Ordinarily, the receiver, as the owner of the legal title to all of the corporation's assets, might be expected to adequately assert a claim on behalf of all who are entitled to the proceeds, including shareholders who receive the excess of the proceeds. But in each of these cases, the failed thrift's only asset that is of any substantial value and capable of producing an excess for the shareholders is a claim against the federal government for its alleged breach of an agreement made by the same federal agency which now occupies the position of receiver. Here, parties with the strongest incentive to maximize damages are the shareholder plaintiffs. FDIC as receiver has little natural incentive beyond fulfilling its obligation to pay depositors and creditors (including itself in another capacity). Thus, there is a compelling practical reason to allow the "derivative" shareholders to remain in this litigation.

The government also offered a "slippery slope" argument, warning that by allowing shareholders to sue derivatively, this court may be flooded with shareholders' derivative suits. We fail to see the likelihood. Our

---

**8.** Another judge of this court recently held the contrary in a similar context. *See First Hartford Corp. Pension Plan & Trust v. United States*, 42 Fed.Cl. 599, 606–08 (1998). However, we feel that our conclusion is supported, even com-

pelled, by the Federal Circuit authority examined in text, given that the claims derivatively asserted are clearly within our jurisdiction. *See also Suess v. United States*, 33 Fed.Cl. 89, 97 (1995).

holding on this issue is limited to the liquidation context in which any surplus, as a matter of law, must be distributed to the shareholders. Further, as a practical matter, this holding will be limited to cases in which there must be a reasonable prospect for recovery of a surplus since it is unlikely that a shareholder would spend money on litigation of this nature without some reasonable expectation of a recovery sufficient to generate a surplus available only to shareholders.

## V

Based on the foregoing, FDIC's motion filed on November 12, 1996 was granted to the extent that it sought intervention as a party-plaintiff in the 43 Winstar-related cases involving a failed thrift, but was denied to the extent that it sought to be substituted for (and to the exclusion of) all shareholder plaintiffs in those 43 cases, all as reflected in the "Order Addressing FDIC's Motion to Intervene" dated March 14, 1997, copy of which is attached.

## ORDER ADDRESSING FDIC's MOTION TO INTERVENE

This order addresses the motion filed November 12, 1996 by the Federal Deposit Insurance Corporation to intervene (as receiver or as manager of the FSLIC Resolution Trust Fund) and be substituted as sole party plaintiff to assert claims for damages caused to failed financial institutions.

## I

The motion, originally affecting 46 "Winstar related" cases, is now directed to only 43 such cases. With respect to 36 cases in which no failed thrift is currently named as a party plaintiff, the motion seeks both intervention and substitution of FDIC in place of all other plaintiffs. The remaining seven cases are those in which a failed thrift had been named as a plaintiff and in which, by order entered March 11, 1997, the FDIC has been substituted as plaintiff in place of the failed thrifts; with respect to these seven cases, the motion seeks to exclude the remaining plaintiffs from participation in the cases.

The 43 cases affected by the motion are listed in the Appendix to this order. The seven cases in which FDIC has been substituted as plaintiff in place of the failed thrifts are indicated by asterisks.

## II

For reasons set forth in open court on January 30, 1997 at the conclusion of the hearing on said motion (and which will be more fully explained in a later opinion), it is ORDERED as follows:

a. To the extent that the motion seeks intervention by the FDIC (as receiver or as manager of the FSLIC Resolution Trust Fund) as a party plaintiff in each of the 36 cases described above in which a failed thrift is not a named party, the motion is GRANTED on the conditions described below. (Pursuant to said order entered March 11, 1997, the FDIC is already a party plaintiff in seven cases described above, having been substituted in place of the failed thrifts which had been named as plaintiffs.)

b. To the extent that the motion seeks substitution of FDIC in place of all other plaintiffs in all 43 cases affected, the motion is DENIED.

## III

Intervention by the FDIC in a particular case is subject to the following conditions:

a. In the six affected "priority" cases (i.e., Castle, No. 90–1291; Anderson, No. 91–34; Glass, No. 92–248; Security, No. 92–577 (consolidated with Bailey, No. 92–817); Landmark, No. 95–502; and Hunt Trust, No. 95–531), FDIC will not initiate any action to adversely affect the priority status or to delay the trial scheduling of any priority case and will comply with the restrictions applicable to priority cases.

b. FDIC shall file its complaint in each of the 36 cases described above (including those on the priority case list) not later than Monday, March 31, 1997. Each such complaint shall state the precise capacity of FDIC (either receiver or manager of the FSLIC Resolution Trust Fund) in the particular case. Remaining plaintiffs may file amended com-

plaints within 21 days after the filing of a complaint by the FDIC, or, if FDIC does not file a complaint within the time allowed, by Monday, April 21, 1997.

## IV

Plaintiffs in five of the affected cases resisted intervention on grounds individual to them which they seek to have addressed. These cases are discussed in the remainder of this part.

### A

In Richard LaVan, *et al.*, No. 90–581, plaintiffs' make several objections to intervention, including untimeliness of the intervention motion, which duplicate objections raised by Plaintiffs' Select Committee on behalf of all plaintiffs and which were resolved in favor of FDIC.

The objection unique to the LaVan plaintiffs is that the Resolution Trust Corporation, FDIC's predecessor in interest, was once in the case as a plaintiff and obtained voluntary dismissal of all counts which asserted a claim on behalf of the thrift of which it was receiver (Century Federal Savings Bank). This objection is also resolved in favor of FDIC. The dismissal, pursuant to order entered on August 12, 1991 at the request of RTC, was without prejudice. RCFC 41(a)(1) concerning voluntary dismissals provides: "Unless otherwise stated in the notice of dismissal or stipulation, the [voluntary] dismissal is without prejudice. . . ."

The fact that FDIC's predecessor in interest took that action is no compelling ground for objection to efforts of the current owner of legal title to the claims to join the litigation and press the claims. Indeed, the LaVan plaintiffs themselves have pending a motion for leave to file an amended complaint so that they can assert as shareholders the claims of the now defunct thrift.

### B

In Hometown Financial Inc., *et al.*, Case No. 90–843, plaintiffs' objections are essentially an attack on the title of FDIC to claims owned by the failed thrift (Hometown Federal Savings Bank, designated in briefing as Hometown II). The attack on title is in the form of an assertion that the RTC receivership upon which FDIC relies for its title to the thrift's claims against the United States was totally defective and invalid. Although the assertion of defective appointment of RTC as receiver would appear untimely, this assertion, like any others going to the merits of any claim which may be advanced by FDIC on behalf of the failed thrift, will be better addressed by the trial or motions judge in the individual case after FDIC files its complaint. Consequently, the undersigned issue judge declines to resolve the title issue at this juncture.

Other objections to intervention asserted by plaintiffs are common to all plaintiffs in the 43 affected cases and will be addressed in a subsequent opinion.

### C

In O. Bruton Smith, *et al.*, No. 92–540, objection to intervention is based on alleged violation of the federal assignment of claims statute and North Carolina law prohibiting champerty in any attempted transfer of the claims of the thrift by RTC as receiver to FDIC as manager of the FSLIC Resolution Fund. This assertion is essentially one that FDIC lacks good legal title to the thrift's unliquidated claims. This assertion, like any others going to the merits of any claim which may be advanced by FDIC on behalf of a failed thrift, will be better addressed by the trial or motions judge in the individual case after FDIC files its complaint. Permitting intervention in no way rules upon the validity of a claim or defense which may be advanced by the intervenor. Consequently, the undersigned issue judge declines to resolve the title issue at this juncture.

### D

In Westfed Holdings, Inc., *et al.*, No. 92–820, plaintiffs assert that FDIC as receiver is precluded from intervention in this case because its predecessor receiver, the RTC, had voluntarily dismissed the thrift's claim in this case as reflected in an order entered May 9, 1994. However, such voluntary dismissal was not stated to be with prejudice and the dismissal order did not expressly preclude a

reassertion of the claim. RCFC 41(a)(1) concerning voluntary dismissals provides: "Unless otherwise stated in the notice of dismissal or stipulation, the [voluntary] dismissal is without prejudice...." Accordingly, this issue is resolved in favor of FDIC.

Other objections to intervention asserted by the Westfed plaintiffs are common to all plaintiffs in the 43 affected cases and will be addressed in a subsequent opinion.

### E

In David Cain, et al., Case No. 95–499, plaintiffs assert that in prior district court litigation, the claims of the thrift institution were dismissed with prejudice and, consequently, cannot lawfully be reasserted now even by the owner of legal title to the thrift's claims. Plaintiffs state that the district court in which the action was pending twice ruled that it had jurisdiction of the action and dismissed claims of the thrift institution (whose claims FDIC purports to assert) with prejudice and that there was no appeal from the findings of jurisdiction or the dismissal with prejudice. Plaintiffs argue that as a result of this background, any claim of the failed thrift institution, even if asserted now by FDIC as receiver or as manager of the FSLIC Resolution Trust Fund, is barred by the doctrine of res judicata.

For two reasons, the undersigned issue judge declines to resolve this argument in ruling upon FDIC's motion to intervene. First, there is some question (though not resolved in this order) of the standing of the remaining plaintiffs to contest the assertion of an intervening plaintiff which cannot adversely affect them; ordinarily, one would anticipate any such challenge to be raised by the defendant. Second, assuming standing to raise the point, plaintiffs are, in essence, asserting that any claim of the failed thrift which FDIC may assert will fail to state a claim on which relief can be granted or, correlatively, be subject to an affirmative defense of res judicata. Any such positions should be addressed by a trial or motions judge in the individual case in response to an appropriate dispositive motion after the FDIC has filed its complaint. Permitting intervention in no way rules upon the validity of a claim or defense which may be advanced by the intervenor.