**FIRST HARTFORD CORPORATION PENSION PLAN & TRUST, on behalf of itself, Dollar Dry Dock Bank of New York, and all other similarly situated shareholders of Dollar Dry Dock Bank of New York, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 99–5032.

United States Court of Appeals, Federal Circuit.

Oct. 19, 1999.

Eric W. Bloom, Winston & Strawn, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Thomas M. Buchanan and Charles B. Klein. Of counsel on the brief was Ralph E. Frable, Attorney at Law, of Washington, DC.

Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were David W. Ogden, Acting Assistant Attorney General, and David M. Cohen, Director.

John V. Thomas, Associate General Counsel, Federal Deposit Insurance Corporation, of Washington, DC, amicus curiae for Federal Deposit Insurance Corporation. With him on the brief were Dorothy Ashley Doherty, Counsel, and John M. Dorsey, III, Counsel.

Before MAYER, Chief Judge, MICHEL and PLAGER, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Chief Judge MAYER dissents-in-part.

MICHEL, Circuit Judge.

First Hartford Corporation Pension Plan & Trust ("First Hartford") is a shareholder of Dollar Dry Dock Bank of New York ("Dollar"), a state-chartered mutual savings bank that resulted from the merger of two financially troubled savings banks. As a condition of the merger, the two banks entered into an agreement with the Federal Deposit Insurance Corporation ("FDIC") requiring Dollar to maintain certain minimum levels of total capital, but permitting Dollar to amortize the intangible asset of supervisory goodwill over fifteen years in its accounting treatment of the merger. First Hartford filed suit in the Court of Federal Claims alleging breach of contract and unconstitutional taking and seeking rescission as a result of the FDIC's promulgation of a rule prohibiting the inclusion of supervisory goodwill in the calculation of regulatory capital despite the contractual language to the contrary. First Hartford purported to file suit on behalf of itself, derivatively as a shareholder on behalf of Dollar, and on behalf of a putative class of similarly situated Dollar shareholders. First Hartford now appeals from the judgment of the Court of Federal Claims granting the motion of the United States to dismiss First

Hartford's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. *See First Hartford Corp. Pension Plan & Trust v. United States*, 42 Fed. Cl. 599 (1998). In particular, the court held that First Hartford lacked privity of contract with the United States, that shareholder derivative suits in the Court of Federal Claims were barred by binding precedent, that First Hartford failed to identify a property interest subject to a taking, and that First Hartford failed to plead mutual mistake or fraud with sufficient particularity in its rescission count.

We reverse the judgment of the Court of Federal Claims with respect to its dismissal of First Hartford's takings claims because we have previously held that a shareholder's direct interest in a liquidation surplus is a cognizable property interest the taking of which by the federal government gives rise to standing to sue. We also reverse the judgment with regard to the dismissal of First Hartford's breach of contract claims on the ground that the Court of Federal Claims does not lack jurisdiction to hear contract suits filed derivatively by shareholders. We hold, however, that standing to sue is only found here because of the FDIC's conflict of interest by which it is both alleged to have caused the breach and controls the depository institution. Finally, we affirm the judgment with respect to the rescission claims because the United States was not a party to the contracts under which the shareholders invested their capital in Dollar.

## BACKGROUND

Dollar was formed in 1983 as a result of the merger of Dollar Savings Bank of New York and Dry Dock Savings Bank. The financially troubled merging banks entered into an Assistance Agreement with the FDIC as a condition of the merger and Dollar, the resultant merged bank, conse-

quently became an FDIC-insured, New York State-chartered mutual savings bank. Dollar nonetheless continued to suffer losses and thus, in order to enhance its ability to raise capital, sought approval from the FDIC to convert from a mutually-held institution into a stock-form institution. In approving the conversion, the FDIC agreed to the cancellation of the Assistance Agreement to be replaced by an Amended and Restated Assistance Agreement (the "Amended Agreement"), dated July 18, 1986, under which the FDIC continued to provide financial assistance. The Amended Agreement required Dollar to maintain certain levels of minimum total capital, as defined by regulation, and permitted the FDIC to increase those minimum total capital requirements if changed conditions warranted such an increase. Paragraph 1.22 of the Amended Agreement provided:

> Total Capital shall not be reduced by goodwill or any other intangible asset arising from the accounting treatment of the Conversion; provided however, that goodwill or any other intangible asset arising from any other sources shall constitute a reduction from Total Capital to the extent required by any rule, regulation, policy of general application, or order of the FDIC.

"Goodwill" is defined as the excess of the cost to the acquirer of purchasing the financial institution (including the liabilities assumed by the acquirer) and the fair market value of the acquired financial institution's assets at the time of the acquisition.[1] *See Winstar Corp. v. United States*, 64 F.3d 1531, 1535–36 (Fed.Cir.1995) (en banc), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). This intangible asset termed "goodwill" could be recorded as an asset on the acquirer's books and, in accordance with Paragraph 1.12 of the Amended Agreement, amortized over fifteen years ending June 30, 2001, on a straight-line basis. The use of goodwill

---

1. Because of the context of the transaction at issue being a supervisory merger of a failed financial institution, the goodwill is commonly referred to as "supervisory goodwill."

thus essentially permitted Dollar to treat what was a deficit in capital as an asset, including for purposes of satisfying minimum total capital requirements. According to First Hartford, Dollar amortized approximately $96 million of goodwill between the effective date of the Amended Agreement and December 21, 1990, and met its mandated capital requirements during that period. *See* Compl., ¶ 29 (Dec. 20, 1996).

On December 21, 1990, Dollar, the FDIC, and the Superintendent of Banks for the State of New York ("Superintendent") executed a Memorandum of Understanding (the "MOU"), which prohibited Dollar from paying cash dividends or other such payments until it attained a total capital ratio of six percent, some two percentage points higher than the ratio required by the Amended Agreement.

On December 19, 1991, the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236 (1991) ("FDICIA"), was enacted. This set forth new capital requirements for federally insured banks. The FDIC subsequently interpreted FDICIA, by rule effective December 19, 1992, to prohibit the inclusion of supervisory goodwill in calculating regulatory capital, notwithstanding the contractual language here to the contrary. Following this change, Dollar was unable to meet its capital requirements. Consequently, on February 21, 1992, the Superintendent seized Dollar and appointed the FDIC as receiver. That same day, the FDIC sold Dollar's branches to various third parties.

First Hartford, a pension plan for First Hartford Corporation, has continuously owned 20,750 shares of Dollar Class A Convertible Junior Preference Stock from July 1986 through the present. On December 20, 1996, First Hartford filed suit in the Court of Federal Claims. First Hartford purported to bring suit for itself, on behalf of similarly situated Dollar shareholders, and derivatively on behalf of Dollar. First Hartford's complaint alleged six counts against the United States:

(I) breach of contract due to the FDIC's raising of Dollar's capital ratio requirement in the MOU in alleged violation of the Amended Agreement;

(II) breach of contract because the FDIC directed, recommended, or caused the Superintendent to seize Dollar in breach of the Amended Agreement;

(III) unconstitutional taking under the Fifth Amendment resulting from the FDIC taking Dollar's contractual right to amortize its goodwill and the FDIC's direction or recommendation that the Superintendent seize Dollar;

(IV) unconstitutional regulatory taking under the Fifth Amendment of the contractual right to treat goodwill as an amortizable asset, contrary to the reasonable investment-backed expectations of First Hartford and other shareholders;

(V) a claim for rescission of the shareholders' investments due to the change in the FDIC's treatment of goodwill; and

(VI) breach of contract based upon First Hartford and the other Dollar shareholders being the intended third-party beneficiaries of the Amended Agreement.

Based upon the above six counts, First Hartford requested as relief:

(i) that the action be certified a class action on behalf of all the shareholders of Dollar;

(ii) that Dollar, First Hartford, and other Dollar shareholders be awarded damages;

(iii) that Dollar, First Hartford, and other Dollar shareholders be awarded the return of their investments;

(iv) that damages awarded derivatively be awarded to Dollar in trust for the shareholders; and

(v) that attorney fees, costs, interest, and any other just relief be awarded.

On November 20, 1998, the court granted the government's motion to dismiss the Complaint pursuant to Court of Federal Claims Rule ("RCFC") 12(b)(1) for lack of subject matter jurisdiction and RCFC 12(b)(4) for failure to state a claim upon which relief can be granted.

*The breach of contract counts*

The court first examined the breach of contract claims set forth in Counts I, II, and VI, and concluded that First Hartford had failed to establish jurisdiction to maintain the action on its own behalf, as a third party-beneficiary, or derivatively on behalf of Dollar. *See First Hartford,* 42 Fed. Cl. at 604–16.

With respect to First Hartford's breach of contract claims on its own behalf, the court ruled that the statutory waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), did not provide it with jurisdiction to hear such claims because First Hartford was not a party to the Amended Agreement and thus not in privity of contract with the government. *See First Hartford,* 42 Fed. Cl. at 604. The Court of Federal Claims also held that it lacked jurisdiction to hear First Hartford's breach of contract claims as a third-party beneficiary. The court reasoned that Paragraph 10.1 of the Amended Agreement expressly precluded there being any third-party beneficiaries. *See id.* at 605–06.

The Court of Federal Claims then concluded that it lacked jurisdiction to hear First Hartford's claims for breach of contract in the form of a shareholder derivative action. The court first noted that there is no counterpart in the RCFC to Federal Rule of Civil Procedure 23.1, which governs shareholder derivative suits. In addition, the court reasoned that it was bound by Court of Claims precedent in the *Whited* cases, which "clearly hold that this Court does not have jurisdiction to adjudicate shareholder derivative claims." *Id.* at 607–08; *see also Whited Co. v. United States,* 229 Ct.Cl. 623 (1982); *Whited v. United States,* 230 Ct.Cl. 911

(1982); *Whited v. United States,* 230 Ct.Cl. 963 (1982). The Court of Federal Claims explained that the *Whited* cases were distinguished by *Suess v. United States,* 33 Fed. Cl. 89 (1995), on the ground that the absence of a specific rule permitting shareholder derivative suits was not a bar to jurisdiction. *See First Hartford,* 42 Fed. Cl. at 608. However, the Court of Federal Claims rejected *Suess,* reasoning that it "should not be followed" because the *Whited* cases were binding precedent precluding such jurisdiction. *Id.* The court also explained that the *Suess* court had misinterpreted *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (Ct.Cl.1972), a case in which the claims of over a thousand American Indians were permitted to proceed against the government in a class action form. The *First Hartford* court reasoned that these plaintiffs had already established jurisdiction individually, whereas here no shareholder had established that it could bring suit on its own. *See First Hartford,* 42 Fed. Cl. at 608–10. Although in a derivative suit the shareholder brings suit on behalf of the corporation, the court maintained that this would not vest the court with jurisdiction because that derivative procedure relates only to standing, not jurisdiction. *See id.* at 610.

Furthermore, the Court of Federal Claims rejected the argument that the shareholders had a status similar to that of sureties who have been permitted to sue despite not being a party to the contract. *See id.* at 610–12. The court reasoned that claims may not be brought by those with an interest in government contracts, nor even general liability insurers, unless that party has a direct responsibility for contract performance. *See id.* at 611. Thus, because First Hartford was not obliged with respect to Dollar's obligations to the government, the court reasoned it did not have jurisdiction to hear its claim as a surety. *See id.* at 612. The Court of Federal Claims further declared that, as a policy matter, derivative suits would not be

advisable because they would likely "clog the Court with meritless claims and duplicative suits unrelated to the determination of contract claims against the Government," as well as "force this Court into the role of a receiver." *Id.* at 612.

Even if derivative suits were allowed, the court ruled that First Hartford had failed to state a claim. In particular, the court declared, the right to bring a derivative suit was vested in the FDIC, as receiver, and a shareholder could only bring a derivative suit after joining the receiver. *See id.* at 613–14. In addition, the court stated that shareholders such as First Hartford could not be granted a judgment and awarded damages because the claim belonged to the FDIC. *See id.* The court rejected the argument that the shareholders had a vested interest in obtaining the funds due to the bank being in receivership, on the ground that the legislative scheme specifically set forth that the FDIC was to act as the receiver and thus to determine what actions to take on behalf of the stockholders. *See id.* at 614–15. The Court of Federal Claims further rejected the argument that this created a conflict of interest in which the government (i.e., the FDIC) was being asked whether it wished to sue itself, reasoning that the FDIC was sufficiently independent as demonstrated by the *Winstar* litigation, that the FDIC would be subject to the duties imposed on receivers under New York law, and that Congress intended the FDIC to act in this role. *See id.* at 615–16.

*The rescission count*

The court then examined the rescission claim in Count V and concluded that because First Hartford could not bring a claim for itself, with the other shareholders, or derivatively, the court lacked jurisdiction to hear the rescission claim. *See id.* at 616. Moreover, even if it could hear the claim, the court held that First Hartford failed to plead mutual mistake or fraud with sufficient particularity. *See id.* at 617.

*The takings counts*

Finally, the Court of Federal Claims addressed the takings claims in Counts III and IV and held that they too must be dismissed because First Hartford failed to identify an ownership interest that was taken. *See id.* at 617–19. While First Hartford owned stock in Dollar, the property allegedly taken was not that stock but rather the right to treat goodwill as a tangible asset. Thus, the court reasoned that First Hartford could not bring such a claim because it was not the owner of that contractual right. *See id.* at 618. To the extent that the taking was premised on a decline in stock value, the court concluded that only Dollar or the FDIC as receiver would have standing to bring such a claim. *See id.* Although in *California Housing Securities, Inc. v. United States,* 959 F.2d 955 (Fed.Cir.1992) and *Branch v. United States,* 69 F.3d 1571 (Fed.Cir.1995), this court held that shareholders of depository institutions had standing to bring takings claims to recover a potential liquidation surplus, the Court, of Federal Claims distinguished those cases on grounds including that "First Hartford is neither the trustee of the bank, nor the sole owner, and does not have a direct vested interest in any surplus created by the liquidation of Dollar." *First Hartford,* 42 Fed. Cl. at 608.

First Hartford timely appealed the Court of Federal Claims' dismissal of its complaint to this court where the appeal was submitted for our decision following oral argument on August 3, 1999. In addition to the briefing of the parties, we have also considered an *amicus curiae* brief filed by the FDIC. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) (1994).

## ANALYSIS

### I. Standard of Review

"This court reviews *de novo* whether the Court of Federal Claims possessed jurisdiction and whether the Court of Federal

Claims properly dismissed for failure to state a claim upon which relief can be granted, as both are questions of law." *Wheeler v. United States*, 11 F.3d 156, 158 (Fed.Cir.1993). "A court may dismiss for failure to state a claim upon which relief may be granted only when it is beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed. Cir.1998). "On review, as in the trial court, we must accept the plaintiff's factual allegations in the complaint as true, drawing all reasonable inferences in favor of the plaintiff. Because granting such a motion summarily terminates the case on its merits, courts broadly construe the complaint." *Ponder v. United States*, 117 F.3d 549, 552–53 (Fed.Cir.1997) (citation omitted).

## II. The Takings Counts

■ We turn first to Counts III and IV of the complaint alleging an unconstitutional taking without just compensation because the dismissal of these counts raises issues that fit most squarely within our precedent. We agree with First Hartford that we previously held that the Court of Federal Claims has jurisdiction to hear, and the parties had standing to bring, materially identical claims in *California Housing* and in *Branch*. Consequently, we reverse the dismissal of the complaint with respect to Counts III and IV.

In *California Housing*, this court . affirmed the summary judgment of the Claims Court that the appointment and subsequent actions of the Office of Thrift Supervision and the Resolution Trust Corporation ("RTC") as conservator and receiver of a California-chartered, federally-insured savings and loan association in which the plaintiff was the sole shareholder were not a compensable taking under the Fifth Amendment. In affirming, this court declined to address whether the Claims Court would have jurisdiction to entertain a shareholder derivative suit, but instead construed the complaint as setting

forth that the shareholder possessed a cognizable property interest in the surplus that would result if the corporation received compensation. *See California Housing*, 959 F.2d at 957 n. 2. Specifically, this property interest arose under the statutory direction that, in its role as a conservator or receiver, the RTC was to pay all claims and administrative expenses and then transfer any remaining funds to the depository institution's shareholders. *See* 12 U.S.C. § 1821(d)(11)(B) (Supp. II 1990) (current version at 12 U.S.C. § 1821(d)(11)(A) (1994)). The court thus held that the Claims Court had jurisdiction to hear, and the plaintiff shareholder had standing to bring, the takings claims because "such a transfer would be to [the plaintiff] as sole shareholder." *California Housing*, 959 F.2d at 956.

A similar issue was presented in *Branch*. In *Branch*, this court held that it was not an unconstitutional taking when the federal government, through the FDIC and the Comptroller of the Currency, seized the assets of a bank to offset losses resulting from the failure of another bank owned by the same bank holding company. Although not raised before the Court of Federal Claims, this court addressed whether the Court of Federal Claims had jurisdiction to hear the claim of the trustee in bankruptcy of the bank holding company. Relying upon *California Housing*, the court found it unnecessary to address whether the trustee could bring his claim as a shareholder derivative action. *See Branch*, 69 F.3d at 1574–75. Instead, the court reasoned that "[a] judgment favorable to the plaintiff in this case would increase the assets of [the bank holding company] and could result in a surplus that would benefit [the bank holding company's] shareholders." *Id.* at 1575. Consequently, "because the complaint can be construed as an action by the trustee of [the bank holding company] to recover assets for that corporation, the Court of Federal Claims had jurisdiction over the action, regardless of whether the court

could properly have exercised jurisdiction on a shareholder derivative theory." *Id.*

The same principle applied in *California Housing* and *Branch* is equally applicable here. First Hartford, as a shareholder in Dollar, has a property interest in any eventual liquidation surplus. The interest in that liquidation surplus is created by the statutory direction that, if funds remain after all depositors, creditors, and other claimants have been paid, the receiver is to distribute such funds to the depository institution's shareholders. *See* 12 U.S.C. § 1821(d)(11) (1994). This contingent interest in a liquidation surplus is not materially distinct from the property interests at stake in *California Housing* and *Branch* because in those cases, like here, a judgment favorable to the plaintiff would increase the assets of the depository institution and thus potentially enlarge any liquidation surplus to be distributed among the shareholders.

The Court of Federal Claims reasoned that "[b]oth *Branch* and *California Housing*, are distinguishable from the present case because First Hartford is neither the trustee of the bank, nor the sole owner, and does not have a direct vested interest in any surplus created by the liquidation of Dollar." *First Hartford,* 42 Fed. Cl. at 608. We do not find these distinctions material. That First Hartford is not a trustee in bankruptcy is certainly immaterial given that in *California Housing* the complaint was not filed by a trustee in bankruptcy but instead "filed by a sole shareholder on behalf of a corporation." *California Housing,* 959 F.2d at 957 n. 2. The Court of Federal Claims' statement that First Hartford "does not have any direct vested interest in any surplus" is also not a persuasive distinction. The interest in the surplus identified in *California Housing* and *Branch* was not vested, but rather contingent, as here, upon funds remaining after all depositors, creditors, and other claimants being paid. At that point, any shareholder's interest would be both direct and vested.

We also do not find it significant that First Hartford was not "the sole owner." That the shareholders in *Branch* and *California Housing* were the sole shareholders of their depository institutions was not material to our disposition in those appeals. A different judge of the Court of Federal Claims recently rejected this very argument when advanced by the government in *Plaintiffs in all Winstar–Related Cases at the Court v. United States,* 44 Fed.Cl. 3 (1999). As the court there stated, "[t]his is a distinction without a difference. The multiple shareholders in each of these cases could easily form one holding company, thus satisfying the 'sole shareholder' requirement." *Id.,* 44 Fed. Cl. at 11. We agree with the reasoning of the *Winstar–Related Cases* court and reject any distinction based upon the number of shareholders of the failed depository institution. While that issue might affect the *quantum* of the interest, it does not affect whether that interest is a cognizable property interest for purposes of a Fifth Amendment takings claim.

The Court of Federal Claims also distinguished *California Housing* and *Branch* on the grounds that Dollar "appears not to have been completely liquidated by the receiver" and that the complaint "does not allege that a surplus will be created or even that Dollar['s] . . . debt would be paid off if [its] derivative suit proves successful." *First Hartford,* 42 Fed. Cl. at 608. However, the stage reached in the liquidation would appear irrelevant to whether the government's regulatory change to the accounting treatment of supervisory goodwill constituted a taking, provided that a liquidation was underway that could create a surplus thereby triggering a shareholder distribution under 12 U.S.C. § 1821(d)(11). Finally, given our obligation to construe the complaint broadly drawing all inferences in First Hartford's favor, *see Ponder,* 117 F.3d at 552–53, we do not read the rather general statements in First Hartford's complaint so narrowly as not to allege such a taking.

## III. The Breach of Contract Counts

*The direct breach of contract claims*

 First Hartford argues that it has standing, and the Court of Federal Claims has jurisdiction to hear, its direct breach of contract action brought both on behalf of itself and on behalf of the other Dollar shareholders for recovery of the liquidation surplus. We are not persuaded that First Hartford has standing to bring such direct breach of contract claims. Only Dollar entered into the Amended Agreement with the FDIC—not Dollar's shareholders. Thus, First Hartford and other similarly situated shareholders lacked privity of contract with the government. As a general proposition, the "government consents to be sued only by those with whom it has privity of contract." *Erickson Air Crane Co. of Wash. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984). There are exceptions to this general rule. Thus, for example, despite lack of privity, we have held that suits may be brought against the government in the Court of Federal Claims by an intended third-party beneficiary, *see Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997), by a subcontractor by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages, *see E.R. Mitchell Const. Co. v. Danzig,* 175 F.3d 1369, 1370–71 (Fed.Cir. 1999), and by a Miller Act surety for funds improperly disbursed to a prime contractor, *see Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160–63 (Fed.Cir. 1985). However, the common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity. A shareholder lacks any such contractual obligation. Indeed, one of the principal motivations behind utiliz-

ing the corporate form is often the desire to limit the risk of ownership to the amount of capital invested and thus avoid the obligations, contractual or otherwise, of the corporation. Consequently, First Hartford and other similarly situated shareholders may not bring breach of contract claims on their own behalf in the Court of Federal Claims.

*The derivative breach of contract claims*

### A.

██ First Hartford also contends that it has standing to bring, and the Court of Federal Claims has jurisdiction to hear, claims brought derivatively on behalf of Dollar for breach of the Amended Agreement. First Hartford acknowledges that the RCFC has no direct counterpart to Rule 23.1 of the Federal Rules of Civil Procedure, which expressly governs derivative actions by shareholders in the federal district courts, but argues that RCFC 17(a) nonetheless provides for such shareholder derivative actions. We disagree. RCFC 17(a), like its similarly numbered counterpart in the Federal Rules of Civil Procedure, simply provides, in relevant part, that "[e]very action shall be prosecuted in the name of the real party in interest." We do not read this rule as an express declaration of jurisdiction or that shareholders have standing to bring derivative suits in the Court of Federal Claims. Rather, it sets forth the broad and general principle that actions should be brought in the name of the real party in interest and that courts should be lenient in permitting ratification, joinder, or substitution of that party.

In any event, the presence or absence of an RCFC does not determine the jurisdiction of the Court of Federal Claims.[2] *See*

---

2. Likewise, Rule 23.1 of the Federal Rules of Civil Procedure is not the substantive basis of derivative actions; it merely sets forth procedural pleading requirements. *See* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.1.04 (3d ed.1997) (entitled "Rule [23.1] Creates Procedural Requirements Without Af-

fecting Substantive Rights"). Under Rule 82 of the Federal Rules of Civil Procedure, the existence of a rule is immaterial to the question of jurisdiction. *See* Fed.R.Civ.P. 82 ("These rules shall not be construed to extend or limit the jurisdiction of the United States

*Rolls–Royce Ltd. v. United States,* 176 Ct. Cl. 694, 364 F.2d 415, 419 (Ct.Cl.1966) ("[T]he court cannot, through its acknowledged rule-making power, expand its jurisdiction beyond the limits prescribed by Congress."). Rather, the court's jurisdiction is determined by the waiver of sovereign immunity contained in the Tucker Act. "Under the Tucker Act, the court has jurisdiction 'to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States.'" *Southfork,* 141 F.3d at 1132 (quoting 28 U.S.C. § 1491(a)(1)).

■ Similarly, the absence of an RCFC does not determine standing to bring shareholder derivative actions. Standing reflects both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Constitutional limitations relate to a court's jurisdictional power under Article III, which requires that the plaintiff "show that he has personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Prudential limitations, by comparison, involve a court's administrative discretion to hear a case; they are those that the judiciary imposes "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone,* 441 U.S. at 99–100, 99 S.Ct. 1601.

■ The shareholder derivative standing requirements of Federal Rule of Civil Procedure 23.1 involve prudential limitations, not constitutional limitations. *See Ensley v. Cody Resources, Inc.,* 171 F.3d 315, 320 n. 2 (5th Cir.1999) (citing *Lewis v. Knutson,* 699 F.2d 230, 236–38 (5th Cir. 1983)); *cf. Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,* 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990) (associating the "shareholder standing rule" with prudential standing requirements). Consequently, the absence of an RCFC counterpart to Rule 23.1 does not establish that the Court of Federal Claims lacks jurisdiction to decide shareholder derivative actions, but rather demonstrates that the Court of Federal Claims has not limited its requirements for shareholder standing by rule.

■ Although the Court of Federal Claims considered itself bound by Court of Claims case law interpreting the Tucker Act to prohibit shareholder derivative suits, we do not agree that the Court of Claims held or even stated in dicta that the Tucker Act contained such a prohibition.[3] The Court of Federal Claims explained that the prohibition against shareholder derivative suits is set forth in a series of three Court of Claims cases: *Whited Co. v. United States,* 229 Ct.Cl. 623 (1982) ("*Whited I*"), *Whited v. United States,* 230 Ct.Cl. 911 (1982) ("*Whited II*"), and *Whited v. United States,* 230 Ct.Cl. 963 (1982) ("*Whited III*"). We do not read these cases as interpreting the Tucker Act to contain any such per se prohibition.

Whited Company, Inc. was a closely held corporation with only two shareholders, Randall Whited and his wife, that brought suit for an alleged breach of a government contract in the Court of Claims. The peti-

---

district courts or the venue of actions therein.").

**3.** We recognize that both we and the Court of Federal Claims are bound by the decisions of

the Court of Claims, this court's predecessor court. *See South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982).

tion was dismissed in *Whited I* when Mr. Whited attempted to sue pro se. The Court of Claims explained that "[t]he rule of this court, which we are not free to change, is that a corporation cannot appear through one of its stockholders (even a major or sole stockholder[ ]) but must be represented by counsel. If attorney representation is not obtained, the suit *by a corporation* will be dismissed." *Whited I,* 229 Ct.Cl. at 623–24 (citations omitted) (emphasis added). In support of this proposition, the Court of Claims relied, inter alia, upon *Algonac Mfg. Co. v. United States,* 198 Ct.Cl. 258, 458 F.2d 1373 (Ct. Cl.1972) and *S.R. Weinstock & Associates, Inc. v. United States,* 650 F.2d 286 (Ct.Cl. 1980) (Table). Thus *Whited I* turned on Mr. Whited's impermissible attempt to represent his corporation pro se.

Mr. Whited and his wife then re-filed the suit together, but the Court of Claims dismissed the petition in *Whited II,* just two months after its first dismissal in *Whited I.* Again citing to *Algonac* and *Weinstock,* the court reasoned that Mr. and Mrs. Whited were not parties to the contract and thus they were "not proper parties and we therefore do not have jurisdiction of this suit." *Whited II,* 230 Ct.Cl. at 912. *Whited II,* therefore, was decided on the ground of lack of privity.

Shortly thereafter, the Whiteds again filed suit, this time alleging that their suit was a "stockholder derivative action" under Federal Rule of Civil Procedure 23.1. The petition was again dismissed in short order. The Court of Claims noted that "[w]hile we might have done so, we have never adopted a counterpart to Federal Rule of Civil Procedure 23.1." *Whited III,*

230 Ct.Cl. at 965. Thus, the court reasoned that:

> In the absence of such a rule, this panel is clearly bound by our previous decisions in *Algonac Manufacturing Co. [v. United States,* 198 Ct.Cl. 258, 458 F.2d 1373 (1972) ] and *S.R. Weinstock & Associates, Inc. [v. United States,* 223 Ct. Cl. 677, 650 F.2d 286 (1980) (Table) ]. . . . Those decisions are clear that a shareholder, even a majority or sole shareholder, may not bring suit as an individual alleging breach of his corporation's contract with the United States. The present petition cannot be brought in this court and will be dismissed.

*Id.*

■ Viewed in the context of the prior two *Whited* decisions, we do not interpret *Whited III* as precluding shareholder derivative suits. The premise of *Whited III* is that "a shareholder . . . may not bring suit *as an individual* alleging breach of his corporation's contract with the United States." *Id.* (emphasis added). In other words, the Court of Claims was not stating that derivative suits are jurisdictionally impermissible, but rather that pro se actions by non-attorneys on behalf of corporations fail for lack of standing. That the Court of Claims was addressing the issue of standing in pro se actions on behalf of corporations is further supported by the opinion reporting that the petitioner was "Randall K. Whited, pro se." *Id.* at 963. In a derivative suit, the shareholder would not have brought suit "as an individual," *id.* at 965, but rather as a fiduciary represented by counsel on behalf of the corporation.[4] Thus, *Whited III* did not address the issue

4. The *Whited III* opinion concluded by addressing a hypothetical request by the plaintiffs:

Plaintiffs may wish to pursue their "derivative action" under Federal Rule of Civil Procedure 23.1 in an appropriate United States District Court. Under 28 U.S.C. § 1346(a)(2), the federal district courts have *concurrent* jurisdiction with this court of all claims against the United States for less than $10,000.

*Id.* at 965 (emphasis added). The court's use of the term "concurrent" suggests that it acknowledged jurisdiction over shareholder derivative actions. Because the court's discussion appears to have been purely conjectural, we decline to rest our conclusions regarding jurisdiction on this portion of the *Whited III* opinion.

of whether the court possessed jurisdiction to hear a shareholder derivative suit, but rather whether a shareholder had standing to bring a pro se action purporting to be a derivative action for purposes of circumventing the prohibition on pro se representation of corporations.[5]

That the *Whited* cases were concerned with the standing of those seeking to represent corporations pro se is further supported by their reliance on the authority of *Algonac* and *Weinstock*. *Algonac* did not address shareholder derivative actions. Rather, it was a government contract case in which, owing to the fact that he was financially destitute, the president and sole stockholder of a contractor sought to bring suit pro se on behalf of the corporation. The court, however, rejected the stockholder's request, explaining "[w]e cannot allow Mr. Maxwell to appear as the attorney for Algonac Mfg. Co., a corporation, in this case because he is not a lawyer. Our rules do not permit such procedure." *Algonac*, 458 F.2d at 1375. Thus, *Algonac* was decided based upon the prohibition against pro se representation of corporations, not any jurisdictional prohibition against derivative actions.

*Weinstock*, the other case relied upon by the *Whited* cases, also did not address jurisdiction to hear derivative actions. *Weinstock* granted the government's motion to dismiss the petition "on the grounds that a corporate plaintiff can proceed only with legal counsel." *Id.*, 223 Ct.Cl. 677, 650 F.2d 286, 1980 WL 99731, at *1 (Ct.Cl. Mar. 21, 1980). In *Weinstock*, the president and sole stockholder of the contractor, a non-lawyer, sought to bring suit for the contractor. The court reasoned that while 28 U.S.C. § 1654 permits individual plaintiffs to proceed without legal counsel, "[t]he statute has never been construed to permit corporations to proceed without counsel ... and the courts have consistently held that attorneys at

law who have been admitted to practice are the only agents acceptable to the court of law." *Id.*, 223 Ct.Cl. 677, 650 F.2d 286, 1980 WL 99731, at *2. The court also held that the individual could not bring suit himself as "a proper party plaintiff" because "[h]e was not a party to the contract involved in this case and does not stand in privity with defendant." *Id.* Thus, like *Algonac*, *Weinstock* cannot be read to prohibit derivative suits on jurisdictional grounds, but rather was premised upon the lack of standing of a person seeking to represent a corporation *pro se*. Although *Weinstock* also held that the individual could not bring suit on his own behalf due to lack of privity, this differs from a derivative suit in which the shareholder files suit on behalf of the corporation, which entity stands within privity. Consequently, the reliance in the *Whited* cases on *Algonac* and *Weinstock* indicates that they were concerned with standing in the context of *pro se* representation of corporations and we therefore disagree with the Court of Federal Claims' conclusion that the *Whited* cases set forth a jurisdictional bar to shareholder derivative suits in that court.

That the Court of Claims in the *Whited* cases did not decide the issue of whether shareholder derivative suits may be brought in the Court of Federal Claims, and that the Court of Claims and this court have not subsequently ruled on the issue, is further confirmed by this court's decisions in *California Housing* and *Branch*. In *California Housing*, this court expressly declined to "decide whether the Claims Court is authorized to entertain a shareholder derivative suit." *California Housing*, 959 F.2d at 957 n. 2. Moreover, in *Branch*, the court even more expressly declared that "[t]his court has not had occasion to address the question whether the Court of Federal Claims has jurisdiction over shareholder derivative ac-

**5.** Though the *Whited III* court mentioned Federal Rule of Civil Procedure 23.1, the Court of Claims did not consider, much less overrule, its earlier opinion in *Rolls–Royce* explicitly rejecting the effect of a local rule on jurisdiction.

tions, and we do not find it necessary to resolve that question in this case." *Branch,* 69 F.3d at 1575. Consequently, we conclude that there is no binding precedent on the issue of whether the Court of Federal Claims possesses jurisdiction to hear shareholder derivative suits.

### B.

■ Although this court has not had occasion to decide whether the Tucker Act precludes the Court of Federal Claims from hearing shareholder derivative suits, several decisions of the Court of Federal Claims have addressed the issue. Of the three decisions directly addressing the issue, only the decision in the instant appeal concluded that the Court of Federal Claims lacks jurisdiction over shareholder derivative actions. In *Suess v. United States,* 33 Fed. Cl. 89 (1995), the court concluded that it had jurisdiction to hear, and the plaintiffs—former shareholders in a failed savings and loan association—had standing to bring, a derivative suit on behalf of the depository institution for breach of contract. The court reasoned that it possessed jurisdiction because the plaintiffs sought contract damages in the form of a money award and that the plaintiffs had standing to sue because their suit was brought derivatively on behalf of the corporation, which was a party to the allegedly breached contract. *See id.* at 93–94. The reasoning of *Suess* was expressly followed in *Slattery v. United States,* 35 Fed. Cl. 180 (1996), in which the court held that it had jurisdiction to hear, and the plaintiff shareholders had standing to bring, a suit alleging that the FDIC had breached a merger assistance agreement with their savings bank by excluding or discounting from its capital calculations a large amount of supervisory goodwill contrary to the contractual agreement.[6] The plaintiff

shareholders in both *Suess* and *Slattery* were represented by counsel.

■ We agree with the reasoning of *Suess* and *Slattery* and hold that, under the circumstances of this case, the Tucker Act's waiver of sovereign immunity for contract actions can extend to contract actions brought derivatively by shareholders on behalf of the contracting corporation. The procedural device of derivative actions does not broaden the scope of the waiver of sovereign immunity. Rather, in circumstances in which those in control of the management of the corporation are unable or unwilling to bring suit, it permits shareholders to step into the shoes of the corporation and file suit as fiduciaries on the corporation's behalf and for the corporation's benefit. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 549, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ("[A] stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character."). Thus, the only claim that can be heard is the corporation's contract claim against the government and the only beneficiary of any relief will similarly be the corporation. *Daily Income Fund v. Fox,* 464 U.S. 523, 528–29, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) ("[T]he term 'derivative action,' ... has long been understood to apply only to those actions in which the right claimed by the shareholder is the one the corporation could itself have enforced in court."). Consequently, permitting derivative suits would not extend the jurisdiction of the Court of Federal Claims to a class of claims not previously within its jurisdiction, but rather would permit standing to shareholders to raise a corporation's direct contract claims under a narrow set of circumstances.

■ Although the origins of the derivative suit are in equity, this does not pre-

---

6. Most recently, in *Winstar–Related Cases,* the Court of Federal Claims declined to address the issue of its jurisdiction to hear derivative breach of contract claims, instead finding jur-

isdiction based upon the theory of a taking of a direct, vested interest in a liquidation surplus. *See id.,* 44 Fed.Cl. 3, 9–12.

clude the jurisdiction of the Court of Federal Claims. The Court of Federal Claims, except for certain narrowly defined circumstances, is prohibited from granting equitable relief. *See, e.g.,* 28 U.S.C. § 1491(b)(2) (Supp. III 1997) (permitting the Court of Federal Claims to grant declaratory and injunctive relief in actions regarding government solicitations). The derivative suit, however, is not a form of equitable relief, but rather a procedural device with origins in equity the use of which does not transgress any jurisdictional limits. Indeed, in *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (Ct.Cl.1972), the Court of Claims held that, despite the prohibition on granting equitable relief, it was within the scope of the court's jurisdiction to hear the claims of numerous Indian tribe members in the form of a class action. As the court explained:·

> Defendant repeats the ancient but inaccurate shibboleth that this court has no "equity jurisdiction", and then argues that since the class suit was originally a creature of equity we cannot use it. The correct premise is, not that we are without equity jurisdiction, but that we cannot grant nonmonetary equitable relief such as an injunction, a declaratory judgment or specific performance. Where the relief is monetary, we can call upon such equitable concepts as rescission and reformation to help us reach the right result. If procedural techniques which are the children of equity were forbidden to this court, we could not utilize such common and useful practices as intervention, depositions and discovery, all of which have become integral to our practice.

*Id.* at 1274 n. 1 (citations omitted); *see also* Fed.R.Civ.P. 1 (abolishing the distinction between actions at law and in equity); RCFC 1(b) (incorporating the Federal Rules of Civil Procedure to the extent

appropriate); *Ross v. Bernhard,* 396 U.S. 531, 541, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) ("Derivative suits have been described as one kind of 'true' class action. We are inclined to agree with the description . . . ." (citations omitted)). Just as the *Quinault* court possessed jurisdiction to hear the monetary claims of the numerous individual claimants as a class for purposes of "speedier and less repetitious litigation," *Quinault,* 453 F.2d at 1274, so here the Court of Federal Claims may use the device of a derivative suit to further the fair and efficient resolution of this dispute. Indeed, the action here was filed both as a class action and a shareholder derivative action.

### C.

■ Our conclusion that the Court of Federal Claims possesses jurisdiction to hear shareholder derivative suits does not end our inquiry. Rather, First Hartford must also persuade us that the Court of Federal Claims erred in holding that it lacked standing to prosecute such a derivative suit. First Hartford has satisfied this burden.

The Court of Federal Claims reasoned that First Hartford lacked standing because only the FDIC, as the receiver, had the authority to bring a claim on Dollar's behalf. *See First Hartford,* 42 Fed. Cl. at 612–16. In support of this, the court relied upon *Pareto v. FDIC,* wherein the Ninth Circuit held that 12 U.S.C. § 1821d(2)(A)(i) (1994) vests in the FDIC, in its capacity as the receiver, all rights and powers of the insured depository institution, including the authority to file suit. *See Pareto v. FDIC,* 139 F.3d 696, 700 (9th Cir.1998). The Court of Federal Claims pointed out · that the FDIC had not brought suit and that "as of yet, the FDIC has not definitively rejected taking action on behalf of the corporation and the FDIC has not been joined as a named defendant." [7] *First Hartford,* 42 Fed. Cl. at 613.

---

**7.** The failure to join the FDIC can be corrected, if warranted, on remand. *See* RCFC 19,

21.

We agree with the Court of Federal Claims that, as a general proposition, the FDIC's statutory receivership authority includes the right to control the prosecution of legal claims on behalf of the insured depository institution now in its receivership. However, the very object of the derivative suit mechanism is to permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation. Indeed, as the Supreme Court has explained, "the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Kamen v. Kemper Financial Services,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (internal quotation marks omitted). "To prevent abuse of this remedy ... courts established as a precondition for the suit that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary circumstances." *Id.* at 95–96, 111 S.Ct. 1711 (internal quotation marks omitted).

Here, First Hartford submitted multiple requests to the FDIC to bring suit, but received responses merely indicating that the FDIC was continuing to consider the matter. Ultimately, First Hartford only filed suit on the final day before the statute of limitations expired. Under such circumstances, it is difficult to construe the FDIC's response as anything but a de facto refusal to sue.

Our conclusion that circumstances here warrant standing is premised not only upon the FDIC's de facto refusal to sue, but also, and most significantly, upon the conflict of interest faced by the FDIC in determining whether to bring suit. Indeed, in the circumstances presented in this case, the FDIC was asked to decide on behalf of the depository institution in receivership whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC itself. Although the Court of Federal Claims reasoned that in the more than forty *Winstar* cases where the FDIC has sued the government "the FDIC has ... demonstrated its independence as receiver," *First Hartford,* 42 Fed. Cl. at 615, we note that those cases alleged a breach by congressional action, rather than directly by FDIC rule-making, that those cases were commenced by private plaintiffs, and that the FDIC did not intervene on behalf of the depository institutions until after the Supreme Court had ruled in the private plaintiffs' favor. Consequently, while we do not infer any bad faith or improper motive on the part of the FDIC, we conclude that the manifest conflict of interest presented here warrants standing for a derivative suit.

In holding that First Hartford has standing to sue derivatively on behalf of Dollar we stress that such standing could only occur in a very narrow range of circumstances. Indeed, our holding is limited to the situation here in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency, as is the case in the receivership context. We neither infer nor express an opinion on the standing of derivative plaintiffs in other circumstances.

### IV. The Rescission Count

Count V of the complaint, entitled and seeking "Rescission of Shareholders' Investment," was dismissed by the Court of Federal Claims both for lack of jurisdiction, due to the parties not standing in privity, and also for failure "to plead that mutual mistake or fraud caused [First Hartford's] reliance and subsequent injury." *First Hartford,* 42 Fed. Cl. at 617. We affirm the court's dismissal on the former ground.

The rescission sought by First Hartford in its complaint is that of the

contract under which First Hartford purchased its shares when, in accordance with the Amended Agreement, Dollar converted from mutually-held to stock-form. *See* Compl. ¶¶ 71–76. As noted by the Court of Federal Claims, "[a] 'rescission' amounts to the unmaking of a contract or an undoing of it from the beginning and not merely a termination of the contract." *First Hartford*, 42 Fed. Cl. at 616 n. 26. The federal government was not a party to the contracts by which First Hartford and other investors purchased shares in Dollar. Unless both the plaintiff and the defendant are parties to the disputed contract, a rescission claim must be dismissed for failure to state a claim upon which relief·can be granted. Accordingly, while we do not foreclose that shareholder capital is perhaps one of several measures of damages that ultimately might be considered on the contract counts, the Court of Federal Claims cannot rescind the share purchase contracts to which the federal government was not a party and thus this count was correctly dismissed.

## CONCLUSION

We reverse the judgment of the Court of Federal Claims with respect to its dismissal of Counts III and IV because First Hartford, as a shareholder in Dollar, possesses a direct and cognizable property interest in a potential liquidation surplus and consequently has standing to sue for its taking. We also reverse the court's judgment with respect to its dismissal of Counts I and II, alleging breach of contract, on the grounds that the court has jurisdiction to hear and, due to the manifest conflict of interest of the FDIC, First Hartford has standing to raise those claims. Finally, we affirm the dismissal of Count V because the Court of Federal Claims cannot rescind the share purchase contracts to which the federal government was not a party. Accordingly, the judgment of the Court of Federal Claims is

*AFFIRMED–IN–PART, REVERSED–IN–PART* and *REMANDED.*

## COSTS

The United States to bear costs.

MAYER, Chief Judge, dissenting in part.

I dissent because I believe we are constrained by the judgment in *Whited v. United States,* 230 Ct.Cl. 963 (1982). The court concludes that *Whited* did not hold that the Court of Claims lacked jurisdiction over shareholder derivative actions. *Ante* at 1290 *et seq.* I disagree.

*Whited* dismissed a shareholder derivative claim because previous cases made it "clear that a shareholder, even a majority or sole shareholder, may not bring suit as an individual alleging breach of his corporation's contract with the United States." *Id.* at 965. Noting that these cases prohibit *pro se* plaintiffs from suing on behalf of a corporation, this court concludes that *Whited* merely denied standing. However, the Court of Claims cited this precedent only after holding that it had not adopted a rule "allowing stockholders to sue the Government on behalf of their corporation." *Id.* It also held that "[w]e are unable to transfer this case [to the district court] directly under 28 U.S.C. § 1506, ... as plaintiffs' claim for damages 'in excess of $10,000' places the present petition beyond any district court's jurisdiction." *Id.* Section 1506 allowed transfer of "a case within the *exclusive jurisdiction* of the district courts." 28 U.S.C. § 1506 (1976) (repealed 1982) (emphasis added). If the Court of Claims had dismissed the action based merely on lack of standing, it would have had no need to address the damages requirement for transferring a case to a district court with otherwise "exclusive jurisdiction." Thus, the Court of Claims held that it·lacked jurisdiction over shareholder derivative actions. *See also Branch v. United States,* 69 F.3d 1571, 1574–75 (Fed.Cir.1995) ("In 1982, the Court of Claims stated that shareholder derivative

actions are not within the court's jurisdiction. *See Whited v. United States,* . . . .").

We are bound by that judgment. *See South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982) (en banc). "This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.*" *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed. Cir.1988). First Hartford has no right to pursue a shareholder derivative claim in the United States Court of Federal Claims.