**FIRST HEIGHTS BANK, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–811C.

United States Court of Federal Claims.

Aug. 7, 2002.

Robert K. Huffman, Washington, D.C., for plaintiffs. With him on the briefs were Cameron S. Hamrick and Jill K. McDowell, of counsel.

Jeffery T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Paul G. Freeborne, Glenn I. Chernigoff, Scott D. Austin, Brian A. Mizoguchi, and Brian L. Owsley, of counsel.

OPINION

BRUGGINK, Judge.

This *Winstar*-related[1] case deals with whether Pulte Corporation, which did not sign an Assistance Agreement between its subsidiaries and the government, may remain with those subsidiaries as a party to a

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

lawsuit seeking to recover losses incurred as a result of the government's breach of contact. In *First Heights Bank, FSB v. United States*, 51 Fed.Cl. 659 (2001), we found that the government breached the implied covenant of good faith and fair dealing when it enacted the Guarini legislation, which retroactively eliminated a tax deduction for covered asset losses sustained by plaintiffs when they sold or wrote off assets of failing thrifts acquired by them under the Assistance Agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). Defendant now moves to dismiss plaintiff Pulte Corporation. Plaintiffs First Heights Bank, FSB ("First Heights"), Pulte Diversified Companies, Inc. ("PDCI"), and Pulte Corporation move once again for summary judgment on liability for defendant's breach of an implied-in-fact agreement. For the reasons set out below, plaintiff's motion is granted and defendant's is denied.

## BACKGROUND

In 1986, Pulte Home Corporation of Bloomfield Hills, Michigan ("PHC"), began investigating the purchase of a failed savings and loan institution from FSLIC. On September 15, 1987, PDCI was incorporated as a subsidiary of PHC. On September 17, 1987, PHM Corporation ("PHM") was formed. On December 7, 1987, PHM took over for PHC as the publicly held parent company of PDCI. In late 1987 and early 1988, PHC (now, presumably, PHM, and whom we will refer to hereafter as Pulte)[2] discussed the acquisition of Heights Savings Association, a failing thrift, with FSLIC. Pulte "determined that a supervisory merger with a troubled thrift, facilitated with FSLIC financial assistance, would complement Pulte's other lines of business.... consist[ing] primarily of residential homebuilding and mortgage banking on a nationwide basis." Letter from James Grosfeld, Chairman of the Board, PHC, to M. Danny Wall, Chairman, Federal Home Loan Bank Board (Mar. 31, 1988).

In February 1988, the Federal Home Loan Bank Board ("FHLBB") approved the "Southwest Plan," which would consolidate various Texas thrifts into "packages" through FSLIC-assisted acquisitions. Pursuant to the Southwest Plan, FSLIC issued a "Request for Proposal" ("RFP") to prospective acquirers of these packages indicating that a covered asset loss deduction would allow acquirers to recognize a tax loss even where there was no economic loss due to FSLIC's tax-free assistance on covered asset losses.

In March 1988, the Southwest Plan Coordinator, J. Richard Earle, instructed FSLIC's director, Stuart Root, to "[m]ake Pulte a player in the Southwest Plan." FSLIC representatives thereafter advised that Heights Savings Association was now included in the Southwest Plan as part of the "OWL" package, along with four other failed thrifts. The FSLIC representatives further advised that, if Pulte still desired to participate in a FSLIC acquisition, it would be required to submit a proposal in response to the Southwest Plan RFP to acquire Heights Savings Association and the four other thrifts: AllenPark Federal Savings and Loan Association ("AllenPark"), Bay City Federal Savings and Loan Association ("Bay City"), Gulf Coast Savings Association ("Gulf Coast"), and Commerce Savings Association ("Commerce").

Pulte responded to the RFP with a March 31, 1988 proposal from its Chairman of the Board, James Grosfeld. The proposal stated that, "[w]ith this letter, [Pulte] is resubmitting its proposal to acquire Heights Savings Association ... and, at the FSLIC's discretion, some or all of [AllenPark, Bay City, Gulf Coast, and Commerce]. [Pulte] proposes to acquire these five institutions ... in a [FSLIC] assisted supervisory merger ...." The proposal also stated that "[Pulte] proposes to effect the transaction through formation of an interim federal association into which the Troubled Institutions will be merged," and that "[t]he Resulting Institution will be capitalized with [Pulte's] contribution of $35 million."

---

**2.** As of December 7, 1987, PHM had taken over for PHC as the publicly held parent company of PDCI. However, communications with the government were still carried out on PHC letter-head. On July 1, 1993, PHM became Pulte Corporation. On May 17, 2001, Pulte Corporation became Pulte Homes, Inc. Both are embraced herein by "Pulte."

The terms of the proposal included a Pulte capital contribution of $35 million, FSLIC capital loss assistance, FSLIC yield maintenance, FSLIC subordinated debenture, FSLIC note interest allowance, thrift warrants, and profit sharing. However, these proposed tax benefits did not include the covered asset loss deduction. The proposal further stated:

> [Pulte] proposes to share with the FSLIC 20 percent of certain annual federal income tax benefits realized from the merger by the *Pulte Consolidated Group....*
>
> Since [Pulte] proposes to share tax benefits based on the profits from *all of its business operations,* not just profits that may be earned from the acquired S & L's, *this tax benefit sharing proposal is also a very substantial profit sharing proposal.*
>
> To demonstrate this clearly, we point to the fact that [Pulte], a New York Stock Exchange Company, is one of, if not the, largest home builders in the United States, as well [as] a very large mortgage banker. It has had an unparalleled and unbroken record of 32 straight years of profits. These annual operating profits have averaged over $50 million in the last 5 years.

In response, during a May 24, 1988 meeting, FSLIC staff requested that Pulte "detail its proposed tax benefit treatment and complete a Term Sheet as soon as possible." On May 31, Grosfeld sent to FSLIC's Tom Lykos, Deputy Executive Director for the Southwest Plan, a letter concerning the "Pulte Southwest Plan Proposal." The letter states: "Enclosed please find the Pulte response to the Term Sheet. Pulte proposes to inject $35,000,000 of GAAP capital, and is not requesting any capital injection by the FSLIC." This proposal did not offer to share with FSLIC any of the covered asset loss deduction benefit.

On July 13, 1988, John Henry, FSLIC's lead negotiator for the OWL package, "informed Pulte that the [May 31, 1988] term sheet was 'unacceptable and that FSLIC wanted 100% of the benefits arising from NOLs, built-in losses [i.e. covered asset losses], and indemnification, and no less than an 80–20 split on benefits from interest pay-

ments on the Note and Yield Maintenance Payments.'" *First Heights,* 51 Fed.Cl. at 661 (quoting Mem. from John Henry to Tom Lykos, Deputy Executive Director for the Southwest Plan (July 15, 1988) at 4). Pulte's response was that, "if FSLIC insisted on those terms, then there could be no deal." Henry responded by stating that, "to the extent Pulte wants a deal different than what I proposed, it must explain in detail why it needs the extra benefits to make the economics work and how FSLIC is benefitting, *e.g.,* by a lower maintenance or note rate, from giving up certain tax benefits." He also noted that:

> Grosfeld said that Pulte's revised proposal would be delivered to FSLIC by Wednesday, July 20 and then he would like to have a meeting the first part of the following week.

> I discussed with Grosfeld Pulte's request to acquire the associations in two stages. He said that it was imperative that Heights be in the first stage, and he would like Commerce to be in the second. I said that if FSLIC allowed a two stage acquisition, Pulte would have to be contractually bound to take the other institutions. This issue was left open pending further discussions.

Grosfeld sent Lykos a letter dated July 19, 1988, containing a revised Term Sheet. Pulte proposed to increase its capital contribution from $35 million to $42 million. It also increased FSLIC's warrant percentage from ten percent to fifteen. Additionally, it offered FSLIC 100 percent of the "tax benefits items related to NOLs from day 1 to the extent they reduce taxable income anywhere within our consolidated group." However, Pulte proposed to retain the other tax benefit items, including 100 percent of the covered asset loss deduction.

John Henry met with Grosfeld, "counsel to Pulte," and others on July 28, 1988, to discuss the OWL package. In an August 1, 1988 memorandum to Thomas Lykos, Henry noted that:

> The third item, tax benefits, involved the most extensive discussion of the meeting. Eventually, Grosfeld offered two alterna-

tives. First, he offered 100% of the NOL's to FSLIC and all other tax benefits to the acquirer. However, Pulte would guarantee that by the end of year two the tangible GAAP capital of the association would be 3½% and by the end of year three and for the rest of the term of the agreement tangible GAAP capital would be 4%. If the association failed that test at any time during the term of the agreement, the FSLIC would be entitled to 85% of the tax benefits based on the earnings and profits of the savings and loan associations. The second proposal was that Pulte would be willing to share fifty/fifty the tax benefits based solely on the earnings and profits of the association. I responded that I thought *the Board was looking for a tax sharing based on savings at the consolidated level,* and I encouraged them to give me a third alternative that included tax savings on a consolidated basis. Grosfeld said that he was unable to do so at the meeting but he would call me back and try and give me such a proposal. He did call on Monday, August 1st and offered 100% of tax benefits based on the earnings and profits of the associations. He said Pulte was unable to give any tax benefits based on the utilization of the tax deductions by the consolidated group.

(Emphasis supplied). Pulte subsequently offered to share twenty-five percent of the tax benefits on a consolidated basis.

On behalf of Pulte, Grosfeld submitted a revised term sheet and letter to Henry on August 8, 1988, forwarding "our revised bid, as per your request." Pulte accepted FSLIC's proposed yield subsidy rates and again offered FSLIC "25% of tax benefits on a 'global' basis, related to net income from operations arising after the date of acquisition ('current operations')." Item seven on the term sheet, entitled "Tax Benefits," states: "25% of all global tax benefits realized by [Pulte] on all [its] operations, including S & L, from date of acquisition."

Pulte submitted revised term sheets on August 9 and 10, 1988. The twenty-five percent "global" tax benefits offer remained unchanged. Item seven of both the August 9 and 10 term sheets, entitled "Tax Benefits,"

states "25% of all global tax benefits realized by [Pulte] on all [its] operations, including S & L, from date of acquisition." Government documents indicate that "Pulte provided the FSLIC with a tax benefit sharing analysis that showed that the FSLIC's 25% share of tax benefits on a 'global' basis would be approximately $3 million per year over 10 years." *First Heights,* 51 Fed.Cl. at 661.

In late August 1988, FHLBB approved final negotiations with Pulte. A case study analyzing the OWL transaction noted that:

> Unlike previous Southwest Plan transactions, a central issue in negotiations between Pulte and FSLIC was the sharing of the tax benefits of the resulting institution. Whereas FSLIC had insisted in earlier transactions on receipt of 100 percent of any tax benefits resulting from net operating losses and imbedded capital losses, FSLIC agreed that Pulte would retain 75 percent of the tax savings realized on a consolidated corporate-wide basis as a result of its acquisition of the OWL thrifts.

Also in late August, FSLIC forwarded the draft tax benefit provision to Pulte.

Shortly before the acquisitions closed, FSLIC substituted Champion Savings Bank Association ("Champion") for Commerce because of doubts over whether FHLBB could make the necessary factual findings of insolvency for Commerce to qualify for the statutory tax benefits before they expired on December 31, 1988. However, "due to complications in [Champion's] asset portfolio that had to be resolved in order for Pulte to realize certain tax advantages, the Champion acquisition was postponed" and Champion was not available to close with the remaining four OWL acquisitions. Accordingly, Pulte and FSLIC agreed to consummate the acquisition in two phases- the first to include the acquisition of the four associations from the original OWL package and the second to include the acquisition of Champion.

A September 8, 1988 "Executive Summary" memorandum from Darrel W. Dochow (Federal Home Loan Bank System) to John M. Buckley, Jr. (Federal Home Loan Bank System) noted that Pulte and PDCI proposed to acquire the thrifts through two new-

ly formed subsidiaries: First Heights, FSA, and Heights of Texas, FSB. The Executive Summary, under the heading "ACQUI-RORS" and subheading "Transaction," states:

> The transaction will be structured in the following manner. The Board will charter a new federal stock savings association, First Heights, whose stock will be wholly-owned by PDCI. First Heights will be initially capitalized in the amount of $30 million, comprised of cash and other unencumbered assets, the value of which will be guaranteed by [Pulte] and PDCI. Within a year, an additional $15 million will be contributed to First Heights. First Heights will acquire substantially all the assets and liabilities of Heights in a purchase and assumption transaction with the FSLIC as receiver of Heights.
>
> . . . .
>
> Shortly after the acquisitions, [Pulte] will transfer from First Heights to Heights Texas a substantial portion of Heights' former assets and liabilities, the FSLIC note issued for the negative net worth of Heights, and a proportionate share of First Heights' initial capital. All FSLIC assistance attributable to Heights' transferred assets and liabilities would remain payable to First Heights after the transfer, subject to a commitment by First Heights to contribute to Heights Texas amounts equal to assistance payments received from the FSLIC, immediately upon receipt of such payments. To facilitate this transfer, [Pulte] requests that the Board approve the increase in insured accounts of Heights Texas, Heights Texas' operation of former branches of First Heights as Heights Texas branches, and that all forbearances on the transferred assets be transferred as well.
>
> [Pulte] is structuring the transaction in this manner for two reasons. First, the tiered corporate structure is intended to protect [Pulte], PDCI, [PHC], ICM and all other existing PHM affiliates and subsidiaries from any exposure to financial loss, in excess of their investment, that may result from any catastrophic losses embedded within one of the Target Institutions,

or from the inability of the FSLIC to honor its financial and other commitments under the Assistance Agreement and FSLIC promissory notes due to events beyond its control.

> Secondly, the structure is intended to cause the FSLIC assistance contributed to First Heights and sent down to Heights Texas to be included as earnings and profit at least at the Heights Texas level, even if not at the First Heights level, to avoid recapture of tax benefits realized from the acquisitions due to creation of "phantom income", or a gain in taxable income which is much smaller for financial purposes.
>
> [Pulte] eventually will merge First Heights and Heights Texas, and requests that the Board, in connection with this transaction, determine that such a future merger will be a supervisory merger, as long as it occurs within ten years of the Effective Date of this transaction.

Under the subheading "Financial and Managerial Resources," the summary states:

> Pulte Corporation, through its home building subsidiary, [PHC], is one of the nation's leading home builders. [PHC] operates in 17 markets in 11 states, and has been operating continuously since 1956. [Pulte], through its subsidiaries, conducts operations in three broad areas; home building, mortgage banking and mortgage financing. [Pulte] reported consolidated after-tax net income of $20.7 million for 1986, $37.2 million for 1987 and $7.0 million for the first six months of 1988. Other financial indicators, such as ratio of sales to average monthly inventories, liquidity, ratio of current assets to current liabilities, and return on stockholders' equity appear favorable, indicating a well-managed organization.
>
> . . . .
>
> Based on the available information, we take no objection to the proposed transaction on the grounds of financial or managerial resources.

Under the heading "FORBEARANCES," the summary states that "[i]n connection with the subject transaction, [Pulte] has requested a significant number of non-standard forbearances. These forbearances are neces-

sary to a great extent due to the complexity of the overall operations of [Pulte] and their various subsidiaries . . . ."

First Heights and Heights of Texas were to be created and made subsidiaries of PDCI as part of Pulte's and PDCI's acquisition of the thrifts. Pulte, PDCI, and First Heights (apparently not yet in existence) submitted an Application H-(e)2 to FSLIC pursuant to "Section 408(e)(1)(B) of the National Housing Act and Section 584.4 of the Regulations for Savings and Loan Holding Companies for Approval of Acquisition, Directly or Indirectly, of More than One Insured Institution by Any Other Company." The Application states: "[Pulte], a publicly-held Michigan corporation listed on the New York Stock Exchange, proposes to acquire Heights Savings Association . . . AllenPark . . . Commerce . . . and Gulf Coast . . . ." It further states:

> [Pulte] *at Present.* Presently, [Pulte] is not an operating company. Through its wholly-owned subsidiary, Pulte Diversified Companies, Inc. ("PDCI"), a Michigan corporation, it holds Pulte Home Corporation ("Pulte"), a Michigan corporation and major home builder. Pulte builds homes through various divisions and subsidiaries including Pulte Home Corporation of Texas ("Pulte–Texas") and Pulte Homes of Michigan Corporation ("Pulte–Michigan"), both of which are incorporated in Michigan. Pulte's subsidiaries also include Pulte Financial Companies, Inc. ("PFCI"), which engages in financial transactions with subsidiaries of [Pulte]; First Line Insurance Services, Inc., a Colorado corporation ("First Line"); ICM Mortgage Corporation, a mortgage banking company incorporated in Delaware ("ICM"); and other direct and indirect subsidiaries, including Pulte Home Credit Corporation ("PHCC"), a subsidiary of PFCI.

> *Acquisition of Heights.* [FHLBB] ("Bank Board") would charter a new federal stock savings association, First Heights . . . all of whose stock would be owned by PDCI pursuant to Bank Board authorization under §§ 408(e) and (m) of the National Housing Act . . . . First Heights would have initial capital of $30 million as

measured by generally accepted accounting principles ("GAAP"), comprised of cash and other unencumbered assets, the value of which would be guaranteed by PDCI and [Pulte]. Within a year, an additional $12 million of capital would be contributed in cash and/or such assets.

(Footnotes and paragraph designations omitted). Under the heading "Transactions With Affiliates," the Application states: "In connection with the proposed transaction, [Pulte] has requested a number of waivers of the restrictions on transactions between insured institutions and their holding company affiliates." James Grosfeld, as Chairman of the Board and Chief Executive Officer of Pulte and Chairman of the Board of PDCI, signed the Application.

On September 9 and 23, 1988, FHLBB approved Pulte's acquisition of the OWL package. On September 9, 1988, FHLBB approved Pulte's acquisition of Heights, AllenPark, Bay City, and Gulf Coast in the first phase of the OWL transaction. FHLBB issued Resolution No. 88–952P, entitled "Approval of Organization of First Heights, FSA, and Heights of Texas, FSB, Houston, Texas, and Acquisition of Assets and Liabilities of Heights Savings Association . . . [AllenPark, Bay City, and Gulf Coast] ('Closed Associations')." Resolution 88–952P states that:

> WHEREAS, [PDCI] . . . in connection with its bid to acquire the Associations [Gulf Coast, Heights, AllenPark, and Bay City], has proposed the incorporation and organization by the FSLIC of First Heights, FSA . . . as a new federal stock savings association and Heights of Texas, FSB . . . as a new federal stock savings bank (which will be a wholly-owned subsidiary of First Heights, FSA) pursuant to § 406(a) of the NHA, 12 U.S.C. § 1729(a) (1982), and Pulte has submitted an H-(e)(2) Application ("Application") to the FSLIC, pursuant to § 408(e) of the NHA, 12 U.S.C. § 1730a(e) (1982), and § 574.7 of the Regulations for Savings and Loan Holding Companies ("Holding Company Regulations"), 12 C.F.R. § 574.7 (1988), for prior written approval for [Pulte], through its wholly-owned subsidiary, [PDCI] (sometimes referred to as "Acquirer") to

purchase the common stock of First Heights, FSA and for First Heights, FSA to purchase the common stock of Heights of Texas, FSB (First Heights, FSA, and Heights of Texas, FSB are sometimes referred to individually as a "New Federal" and collectively as the "New Federals"); and

. . . .

WHEREAS, The Bank Board has considered proposed separate acquisition agreements ("Acquisition Agreements") between the respective New Federals and the FSLIC as receiver for each of the Associations, pursuant to which First Heights, FSA will purchase substantially all of the assets and assume all of the secured and deposit liabilities of Heights, and Heights of Texas, FSB will purchase substantially all of the assets and assume all of the secured and deposit liabilities of AllenPark, Bay City and Gulf Coast . . . .

Additionally, Resolution 88–952P states:

RESOLVED FURTHER, That the acquisition of control of First Heights, FSA by [PDCI] and its parent, [Pulte], and the acquisition of Heights of Texas, FSB by First Heights, FSA is hereby approved pursuant to §§ 408(e)(1)(A)(i), 408(e)(3)(B) and § 408(m) of the NHA, 12 U.S.C. §§ 1730a(e)(1)(A)(i), 1730a(e)(3)(B) and § 1730a(m) (1982), and § 574.3 of the Insurance Regulations, 12 C.F.R. § 574.3 (1988) . . . .

The resolution also notes that FHLBB

hereby finds ·and determines that the transfer of substantially all of the assets and all of the secured and deposit liabilities of Heights to First Heights, FSA and of AllenPark, Bay City and Gulf Coast to Heights of Texas, FSB . . . and pursuant to the Acquisition Agreements, should be effected without delay . . . .

Moreover, it states that "the proposed Acquisition Agreements and the proposed Receiver's Agreements are hereby approved."

Also on September 9, 1988, First Heights, Heights of Texas, PDCI, and FSLIC executed the Assistance Agreement. On September 23, 1988, the Assistance Agreement was amended. PHC, PHM, Pulte, and Pulte Homes, Inc. did not sign either of these documents. Nor did PHC, Pulte, or Pulte Homes, Inc. sign any of the September 9, 1988 Acquisition Agreements for the five thrifts acquired by First Heights or Heights of Texas.

The preamble of the Assistance Agreement, which refers to PDCI, First Heights, and Heights of Texas, does not mention Pulte. Section 30 of the Assistance Agreement, the "Sole Benefit" clause, states that the sole benefit of the Assistance Agreement runs to the parties named in the preamble:

It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the Bank and its transferees, successors and assigns as security for indebtedness of [First Heights and Heights of Texas] to the Bank and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto and the Bank and its transferees, successors and assigns any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

There are, however, provisions of the Assistance Agreement as amended which indirectly, but clearly, reference Pulte. They make it apparent that the calculation of net tax benefits offered by the government was based not only on the capabilities of the acquiring associations, but also on those of the Consolidated Group. Section 18(c) of the Assistance Agreement states:

[First Heights and Heights of Texas] shall file their tax returns, including [the] filing of consolidated or separate returns, in such a manner as to maximize any tax benefits arising from the nature or treatment of assistance from [FSLIC] under this Agreement . . . .

Neither First Heights nor Heights of Texas could file a consolidated return on its own. They would have required the cooperation of Pulte, which was the common parent of the consolidated group. As such, Pulte was obli-

gated to include each of its subsidiaries in the group's filings.[3]

This is consistent with section 9, as rewritten in the Amended Agreement, which defines tax benefits and explains how they are to be accounted for. At paragraph (a), that section states:

Net Tax Benefits shall be the tax benefits that are attributable to the items described in § 9(a)(1), (2), (3) and (4) below ("Tax Benefit Items") and that are actually utilized by [First Heights or Heights of Texas], or the consolidated group (as defined in Section 1504 of the Internal Revenue Code) of which it is a member ("Consolidated Group"), to reduce its Federal or state income tax liability in a given tax year, by virtue of a Tax Benefit Item being a tax deduction or being excludable from income for such tax year, as calculated in § 9(c), (d) and (e) below ....

Section 9(c) of the Amended Assistance Agreement also provides that:

The Indemnification Net Tax Benefit for a taxable year shall be equal to the sum of:

(1) The excess, if any, of

(A) The Federal income tax liability for such taxable year ... which would have been incurred by [PDCI and First Heights and Heights of Texas], or the Consolidated Group, (i) if the Tax Benefit Items described in § 9(a)(1), (2), (3) and (4) had not been deducted, credited or excluded in any taxable year, but without adjustment to the bad debt reserve, over

(B) The Federal income tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by [PDCI and First Heights and Heights of

Texas], or the Consolidated Group, if the Tax Benefit Items described in § 9(a)(2) had been deducted and if the Tax Benefit Items described in § 9(a)(1), (3) and (4) above had not been deducted, credited, or excluded in any taxable year, but without adjustment to the bad debt reserve ....

*Accord* § 9(c)(2) (same, for state tax benefit sharing computations). Section 9(h), as rewritten in the Amended Agreement, requires payment to FSLIC thirty days after either "[First Heights and Heights of Texas] or the Consolidated Group file Federal and state income tax returns."

The term "Consolidated Group" is not defined within the Assistance Agreement or the Amended Assistance Agreement, except by reference to 26 U.S.C. § 1504 (1989). That provision would include Pulte, PDCI, First Heights, and Heights of Texas as components of an "affiliated" group.

Under Section 9(k), as rewritten in the Amended Agreement, FSLIC was obligated to indemnify First Heights and Heights of Texas or "other members of the Consolidated Group," i.e., including Pulte,

for any increase in tax liabilities actually incurred by them or any of them in the first tax year of [First Heights and Heights of Texas] by reason of the fact that all or a portion of any assistance payments made by [FSLIC] to either [First Heights or Heights of Texas] in the first tax year of [First Heights or Heights of Texas] pursuant to § 3(a) of this Agreement is included in the gross income of either [First Heights or Heights of Texas] in such year because [Heights of Texas, the subsidiary acquiring association] does not qualify as a domestic building and loan association, as such term is defined in § 7701(a)(19) and referred to in § 597 of

---

**3.** C.F.R. section 1.1502–75(a)(2) states:

A group which filed (or was required to file) a consolidated return for the immediately preceding taxable year is required to file a consolidated return for the taxable year unless it has an election to discontinue filing consolidated returns under paragraph (c) of this section.

26 C.F.R. § 1.1502–75(a)(2) (1993). C.F.R. section 1.1502–75(h)(2) states:

If, under the provisions of paragraph (a)(1) of this section, a group wishes to exercise its

privilege of filing a consolidated return, then a Form 1122 must be executed by each subsidiary and must be attached to the consolidated return for such year. Form 1122 shall not be required for a taxable year if a consolidated return was filed (or was required to be filed) by the group for the immediately preceding taxable year.

26 C.F.R. § 1.1502–75(h)(2).

the Code, for such tax year; *provided* that such failure to qualify is not a result of purchases of assets after the Effective Date by either [First Heights or Heights of Texas].

Also on September 9, 1988, Pulte, PDCI, First Heights, Heights of Texas, and FSLIC executed a "Regulatory Capital Maintenance Agreement" (the "RCMA"). Pulte was identified in the RCMA as the "Investor." The "RECITALS" section of the agreement makes it clear that there is a direct link between the RCMA and the Assistance Agreement:

> [Pulte], an investor-owned Michigan Corporation, owns 100 percent of the outstanding voting securities of [PDCI] and controls [PDCI].
>
> . . . .
>
> A condition of the obligation of [FSLIC] to provide financial assistance and indemnification as set forth in the Assistance Agreement is that [PDCI, First Heights, Heights of Texas, and Pulte] enter into an agreement in the form of this Agreement, pursuant to which [FSLIC] will receive certain assurances and rights with respect to maintenance of the regulatory capital of [First Heights and Heights of Texas].

(Paragraph designations omitted).

Pulte also directly obligated itself to FSLIC in the RCMA with respect to capital maintenance. Section 5, entitled "Covenants of the ACQUIRER and the ACQUIRING ASSOCIATIONS, and the Investor," states:

> [Pulte] shall, directly or indirectly, during the term of this Agreement, own not less than a majority of the outstanding voting power of [PDCI], provided that in determining the outstanding voting power of [PDCI], any stock options, preferred stock warrants, or other instruments or obligations convertible into voting securities of [PDCI] or which, upon the occurrence of one or more events, may acquire any voting rights with respect to [PDCI], shall be included in such determination;
>
> . . . .
>
> [First Heights and Heights of Texas] shall not, and neither [PDCI nor Pulte] shall cause [First Heights and Heights of Texas] to, directly or indirectly, through one or more transactions, issue any voting securities, stock options, warrants or other instruments or obligations convertible into voting securities of [First Heights and Heights of Texas] or which, upon the occurrence of one or more events, may acquire any voting rights with respect to [First Heights and Heights of Texas], except voting rights on default in preferred stock subject to the irrevocable proxy provided for herein, to any person or entity other than [FSLIC, PDCI, and First Heights];
>
> Except as otherwise provided in the Forbearance Letter issued in connection with the Acquisition, [First Heights and Heights of Texas] shall not, and neither [PDCI nor Pulte] shall cause [First Heights and Heights of Texas] to, declare or pay a dividend in any fiscal year (1) that would cause either [First Heights' or Heights of Texas'] Regulatory Capital to fall below the Required Regulatory Capital Level, or (2) that exceeds 50 percent of [First Heights' and Heights of Texas'] combined net income for the fiscal year as reflected on [First Heights' and Heights of Texas'] quarterly financial reports to the Bank Board, without the prior written consent of the P.S.A. and the concurrence of the Regulatory Activities Director, *provided* that any dividends permitted under these limitations may be deferred and paid in a subsequent year, but in no event may [First Heights or Heights of Texas] pay dividends that would reduce its regulatory capital below the Required Regulatory Capital Level.
>
> [First Heights and Heights of Texas] shall not, and neither [PDCI nor Pulte] shall cause [First Heights and Heights of Texas] to, execute any transaction that would convert or have the effect of converting either [First Heights or Heights of Texas] to a state chartered stock or mutual institution . . . .

(Paragraph designations omitted.)

As part of the overall acquisition transaction, Pulte received certain other assurances directly from the government. On September 12, 1988, FHLBB sent a forbearance

letter to Pulte Chairman Grosfeld, stating that:

> In connection with the approval by [FHLBB] ("Board") of the [FSLIC] assisted acquisition by [Pulte] ... and Pulte Diversified Companies, Inc.... through First Heights ... and Heights of Texas ... (collectively "Acquired Institutions") the following forbearances are hereby granted.
>
> ....
>
> [PDCI] and its affiliates shall be permitted to contribute to, buy from, and sell to First Heights and Heights Texas, assets, including real estate, provided that First Heights, Heights Texas and their service corporations shall not assume any debt or any other liability nor incur any carrying costs in connection with such contributed assets, and provided further that the transactions are fair to and in the best interest of the institutions and their service corporations. [PDCI] shall provide prior notice to the SA of these transactions, and shall provide an annual report detailing these transactions to the satisfaction of the SA.
>
> For any such contribution from [Pulte or PDCI] to First Heights that [PDCI] elects not to count as regulatory capital, First Heights shall be permitted to distribute the net proceeds of the sale of such contributed assets as dividends on Non-operating Assets, consistent with Section 2 herein.

The letter's conclusion states:

> The forbearances or waivers extended by this letter do not relieve [Pulte, PDCI,] or First Heights of its continuing obligations to maintain records of its reserve and regulatory capital condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 16....

The government issued and signed similar documents as part of the second acquisition involving Champion.

On November 7, 1989, more than a year after the other documents were executed, Pulte and First Heights entered into a "Tax Allocation and Sharing Agreement" ("TSA"). In this agreement, the word "Group" is defined as an affiliated group of corporations of which Pulte was the common parent. This agreement also identifies First Heights and Heights of Texas as members of the Group and notes that they joined in the filing of its consolidated federal income tax returns for its 1988 taxable year and would continue to join in such filings for the taxable years "for all taxable years thereafter during which FSA [would be] a member of the Group." Section 7 of that agreement, entitled "Agreement by [Pulte] to Fund Net Tax Benefits," states:

> (a) Notwithstanding the fact that the payment of Net Tax Benefits under Section 9 of the Assistance Agreement is the sole obligation of [First Heights and Heights of Texas], and not the obligation of [Pulte] or any other member of the Group, [Pulte] hereby agrees to provide funding to [First Heights] (whether by way of additional capital contributions or as otherwise permitted by applicable law) in the amount of any Net Tax Benefit paid or credited to Special Reserve Account I by [First Heights or Heights of Texas], as the case may be, with respect to any calendar quarter, such funding to be provided within five business days after such payment or credit thereof.
>
> (b) [Pulte] shall have an obligation under Section 7(a) as of any date only if, on such date, there is no default by any party to the Assistance Agreement, which is not a member of the Group, or such party's successors or assigns with respect to any obligation under the Assistance Agreement.
>
> (c) [First Heights] shall maintain a separate reconciliation setting forth (i) the amount of each funding made by [Pulte] hereunder with respect to Net Tax Benefits and (ii) the sum of all such funding amounts (the "Cumulative Net Tax Amount").

It is not clear from the record what prompted the TSA. Neither FSLIC nor FHLBB were parties to that agreement.

In 1995, the FDIC commenced a civil action against plaintiffs, seeking to enforce the tax sharing arrangements. FDIC filed a motion for summary judgment in which it sought a determination that Pulte, PDCI, and First Heights were jointly and severally liable for breaching sections 3(b)(6), 9, and 18(e) of the Assistance Agreement. In *FDIC v. First Heights Bank, FSB*, No. 95–CV–72722 (E.D.Mich. July 7, 1998) (the "Michigan litigation"), the district court found PDCI liable under the Assistance Agreement, but not Pulte. The court noted that Pulte was the sole shareholder of PDCI and not a signatory to the Assistance Agreement.

The Assistance Agreement was in place from 1989 until October 12, 2001, when FDIC and Pulte, PDCI, and First Heights entered into a Termination and Settlement Agreement ("Settlement Agreement"). Article 4, section 4.2, of the Settlement Agreement extended section 9(j) of the Assistance Agreement, its indemnity provision, beyond the Assistance Agreement's termination, stating that it would remain in effect "for tax years through 2001" under various terms and conditions. Section 4.5 addressed the tax sharing provisions of section 9 of the Assistance Agreement, which imposed tax sharing obligations upon First Heights and Heights of Texas with respect to the tax benefits realized by the Consolidated Group on their consolidated return, but not with respect to breach of contract damages that included compensation for the loss of the tax benefits. *See also* Assistance Agreement § 9.

The Settlement Agreement specifically preserved plaintiffs' claims in this litigation, and, at section 4.5, set up a division of any proceeds of this action:

The parties agree that any damages that the Pulte Entities may receive in the Court of Federal Claims Litigation may include compensation in an amount equal to tax benefits attributable to Tax Benefit Items (including Collateral Effects) that the Pulte Entities did not receive as a result of the Government actions alleged in the Court of Federal Claims Litigation and any prejudgment and post-judgment interest awarded thereon ("Tax Benefit Component"), and that FDIC Manager is entitled to 25% of such amount. Accordingly, in the Court of Federal Claims Litigation, in lieu of the 100% award to the Pulte Entities of the Tax Benefit Component and a direct payment of 25% of that amount to FDIC Manager, the Pulte Entities shall be entitled to an award of only 75% of the Tax Benefit Component. In the event that the Pulte Entities are awarded 100% of the Tax Benefit Component in the Court of Federal Claims Litigation, the Pulte Entities are entitled to collect, and the United States is required to pay, only 75% of the Tax Benefit Component. . . .

## DISCUSSION

The critical obligations put at issue by defendant's motion relate to the tax benefits flowing from the Assistance Agreement. Because Pulte did not sign the agreement and because it is not directly mentioned in it by name, defendant argues that Pulte should be dismissed from this suit.[4] Defendant also correctly points out that Pulte does not have standing in this action based solely on its status as a shareholder.[5] The question thus presented is whether the promise not to interfere with the tax benefits flowing from the Assistance Agreement ran to Pulte as well as the holding company and the thrift. In addition, assuming there was such a promise, and that it flowed only from the Assistance Agreement, defendant contends that Pulte's representations in the Michigan litigation bar it from now making any claim to rights under that agreement.

---

4. It is well settled that "[o]nly plaintiffs who are in privity of contract with the government can have standing to bring a claim in this court." *Pacetti v. United States*, 50 Fed.Cl. 239, 244 (2001).

5. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed.Cir. 1999); *Computer Prods. Int'l, Inc. v. United States*, 26 Cl.Ct. 518, 528 (1992); *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 696, 1980 WL 13154 (1980); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 662, 428 F.2d 1241 (1970).

Precise obligations and rights of any given entity in this complex cat's cradle of interlocking documents—the application for acquisition by Pulte, the approval letter, the resolutions, the forbearance letter, the Assistance Agreement, acquisition agreements, the RCMA, and the TSA—are spelled out in the individual component documents. Several reflect a direct relationship between FSLIC and Pulte, such as the application and approval, the forbearance letter, the resolution, and the RCMA, in which the parent obligated itself to maintain the bank's regulatory capital. Certain aspects of the Assistance Agreement also directly affected Pulte, as it is part of the "consolidated group." Moreover, Pulte initiated the application for acquisition and was treated throughout as the negotiating entity for all component parts of the overall transaction. Nor can it be ignored that, when the Assistance Agreement was terminated, Pulte was seen as a necessary party.

The linkage ran in multiple directions within the documents. The RCMA, which Pulte did sign, was directly linked to the Assistance Agreement. The RCMA makes it clear that Pulte's agreement was a condition to FSLIC's obligations under the Assistance Agreement. In addition, the parent corporation agreed to limit its ownership voting rights, its ability to declare dividends, and to incur debt. The agreements cannot be read in isolation. The Assistance Agreement also expressly incorporated "the Acquisition Agreements and any resolutions or letters concerning the Transaction or this Agreement issued by [FHLBB or FSLIC] in connection with the approval of the Transaction of this Agreement." § 27(a). In *Centex Corp. v. United States*, we noted that the parties agreed that section 27 of the Assistance Agreement at issue there, which is nearly identical to section 27 of the Assistance Agreement we review today, "incorporates the four agreements whereby plaintiffs acquired the insolvent thrifts (the 'Acquisition Agreements') and the FHLBB Resolutions approving the transaction." 48 Fed.Cl. 625, 630 (2001).

The question is whether the whole of these individual transactions, insofar as Pulte is concerned, is greater than the sum of its written parts. The language of the Assistance Agreement indicates that this was the case. It recites that it is a component of a larger transaction, defined as "[t]he Acquisition and all related transactions described herein." § 1. We conclude that Pulte and the United States did enter into an implied-in-fact contract, the terms of which are preserved in the various written components of the transaction, but also in implied terms. In broadest outline, Pulte sought and was granted permission to buy, through intermediaries, Heights of Texas in exchange for an infusion of Pulte cash and agreements to maintain the regulatory capital of the thrift. The more specific question, however, is whether Pulte can enforce the implied-in-fact promise the court earlier found in *First Heights I* to the effect that the tax benefits flowing from the transaction would not be deliberately targeted by the government for repeal. We find that such a promise had to be made to Pulte, as well as to the signatories to the Assistance Agreement.

As spelled out above, the negotiations leading to the Acquisition and the Assistance Agreements were conducted between the government's regulators and Pulte. This negotiating history makes it clear that Pulte insisted on its access to the tax benefits then made available by law. The government eventually agreed, on condition that those benefits would be shared by FSLIC, through the mechanisms set up in the Assistance Agreement. First Heights, Heights of Texas, and PDCI could not, by themselves, have satisfied the obligations of sections 9 and 18 of the Assistance Agreement and the Amended Agreement to maximize the tax benefits shared by FSLIC. Only Pulte was in a position to do so. That obligation would be meaningless if Pulte had not independently bound itself, at least in that limited respect, to the government.

Without deciding whether all aspects of the Assistance Agreement run to or against Pulte, it is sufficient for the purposes of this motion to conclude that portions of the Assistance Agreement must be read into a larger implied-in-fact contract between Pulte and FSLIC. Consequently, we find that there

was an implied-in-fact contract between FSLIC and Pulte that Pulte would contribute the consolidated group's capability of maximizing tax benefits.[6] This aspect of the acquisition, in other words, was built around the tax returns of Pulte and its associated corporations, and not simply those of the new thrift. One of the exchanges for that promise was that Pulte, through PDCI, could purchase the failed thrifts. Construing section 30 as defendant proposes would have the effect of nullifying the specific limited terms relating to Pulte, as well as the incorporation clause. Such a construction would also fundamentally undercut the entire rationale of the Assistance Agreement and related transactions.[7]

In sum, we conclude that a necessary implied-in-fact promise of good faith and fair dealing by the United States arose in this transaction, the substance of which was that the United States would not target for repeal the tax benefits Pulte and others achieved by negotiating these acquisitions.

We see no inconsistency with *Roedler v. Department of Energy*, 255 F.3d 1347, 1353–

54 (Fed.Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 648, 151 L.Ed.2d 565 (2001) ("[T]he existence of an express contract between the United States and Northern States Power, establishing their mutual obligations with respect to the fees at issue, negates the existence of an implied-in-fact contract between the United States and the utility's customers on the same subject matter."), and *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997) ("[A]n implied-in-fact contract cannot exist if an express contract already covers the same subject matter."), decisions which were cited by defendant. The missing "subject matter" is supplied by a separate implied-in-fact contract under the terms of which Pulte obligated itself, among other things, to facilitate the maximization of tax benefits.

Because this promise is not premised on whether Pulte is a party for all purposes to the Assistance Agreement, defendant's reliance on Pulte's position in the Michigan litigation is of no direct bearing. Neither collateral[8] nor

---

**6.** Defendant suggests that section 18 of the Assistance Agreement is merely an "allocation of risk between the previously identified parties to [the] agreement." Def.'s Reply Br. at 19. According to the government, a reading of section 18 in its entirety establishes that First Heights and Heights of Texas, as parties to the Assistance Agreement, were obliged to fulfill the covenants contained in section 18, regardless of whether they or Pulte "had to perform the obligations enumerated" there. The government argues that, accordingly, section 18 establishes that First Heights and Heights of Texas assumed the risk that the enumerated obligations would be performed, regardless of whether that performance was beyond their control.

A more natural interpretation of all the relevant documents and circumstances is that Pulte, the government's negotiating and contracting partner, obligated itself to ensure that it would maximize the shared tax benefits, including choosing to file a consolidated return. That is a promise that neither First Heights or Heights of Texas could make. *See* 26 C.F.R. § 1.1502–77(a) ("The common parent, for all purposes ... shall be the sole agent for each subsidiary in the group ....").

**7.** Unlike *Home Savings of America, F.S.B. v. United States*, 51 Fed.Cl. 487 (2002), the parent in this case had certain rights and obligations under the terms of the Assistance Agreement.

The present facts are also distinguishable from *FDIC ex rel. Karnes County Sav. and Loan Ass'n*

*v. United States*, 52 Fed.Cl. 503 (2002), in which the court found that investor plaintiffs in a failed savings and loan institution did not have privity with the government, despite the fact that they provided consideration for the purchase of a failed thrift. The court noted that the investor plaintiffs' involvement in the transaction did not approach the level of involvement found in *Home Savings*. *Id.* at 509.

This case also differs from *Coast-to-Coast v. United States*, 53 Fed.Cl. 241 (2002), in which two parent entities, determined to be no more than shareholder investors, contributed capital to Coast-to-Coast Financial Corporation ("CTC") to enable it to purchase a failing thrift. There, we noted that the negotiations leading to the thrift's acquisition were not linked to the ability of FSLIC, the failing thrift, or CTC to "take advantage of combining tax returns with parent entities." *Id.*

**8.** Collateral estoppel bars "relitigation of any ultimate issue of fact actually litigated and essential to the judgment in the prior suit, regardless of whether the second suit is based upon the same cause of action." *United Tech. Corp. v. Chromalloy Gas Turbine Corp.*, 189 F.3d 1338, 1343 (Fed.Cir.1999) (quoting *National Union Fire Ins. Co. of Pittsburgh v. John Zink Co.*, 972 S.W.2d 839, 846 (Tex.App.1998)). Collateral estoppel requires four elements: "(1) the issues are identical to those in a prior proceeding, (2) the

208

judicial [9] estoppel preclude Pulte's assertion of its claim. The precise question in the earlier case was whether Pulte was responsible under the Assistance Agreement for crediting the Special Reserve Account. We have addressed a different obligation and one not dependent on whether Pulte was a party to all aspects of the Assistance Agreement. Nor do Pulte's representations in that litigation conflict with the holding here.

In light of our holding, it is unnecessary to address Pulte's alternative argument that the Termination Agreement constituted a re-affirmation of Pulte's status as a contracting party with the government.

## CONCLUSION

Plaintiffs' motion for summary judgment is granted. Defendant's motion to dismiss is denied.

issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner v. United States*, 238 F.3d 1348, 1354 (Fed.Cir.2001).

9. Judicial estoppel is "an equitable concept that prevents a party who prevails on one ground in a lawsuit from then repudiating that ground in order to prevail in another lawsuit." *Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1377 (Fed.Cir.2000).