COAST–TO–COAST FINANCIAL COR-PORATION, Coast Partners, UBH, Inc., Plaintiffs,

Federal Deposit Insurance Corporation, as Receiver for Superior Bank FSB, Hinsdale, Illinois, Substituted Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–525C.

United States Court of Federal Claims.

Aug. 7, 2002.

---

**27.** *Id.,* Ex. 4 at 943 (emphasis added).

Melvin C. Garbow, Washington, D.C., for plaintiffs Coast–to–Coast Financial Corporation, Coast Partners, and UBH, Inc. With him on the briefs were Howard N. Cayne, Kent A. Yalowitz, Edward Sisson, and Todd A. Wynkoop, all of counsel.

Glenn I. Chernigoff, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Brian L. Owsley, of counsel.

## OPINION

BRUGGINK, Judge.

This is a *Winstar*-related[1] case. Plaintiffs also assert a claim arising out of the "Guarini" legislation which eliminated certain tax benefits unique to acquisitions of federally-insured savings and loans. On April 18, 2002, we granted summary judgment in favor of plaintiffs Coast–to–Coast Financial Corporation ("CTC") and the Federal Deposit Insurance Corporation ("FDIC"), as receiver for Superior Bank, FSB ("Superior"), with respect to their claim that the passage of the Guarini legislation constituted a breach of contract. *Coast–to–Coast Fin. Corp. v. United States*, 52 Fed.Cl. 352 (2002). Familiarity with the facts set out in that opinion is assumed. Presently pending is defendant's motion to dismiss the identical claim of the remaining plaintiffs, Coast Partners ("Partners") and UBH. For the reasons set out below, defendant's motion is granted.

## BACKGROUND

Two groups of investors contributed capital to make the transaction in this case possible: Alvin Dworman and associated persons and organizations ("Dworman Family Interests") and Jay Pritzker and associated persons and organizations ("Pritzker Family Interests"). Together, they formed CTC for

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

the specific purpose of acquiring Old Lyons, a failing thrift. To complete the transaction, the Dworman Family Interests capitalized UBH with real estate and cash to contribute to CTC, with UBH receiving fifty percent of CTC's stock in return. The Pritzker Family Interests capitalized Partners with real estate and cash for the same purpose.

Under the terms of the transaction, CTC proposed to acquire a failing thrift, Lyons Savings Bank, a Federal Savings Bank, Hinsdale, Illinois ("New Federal"), which had merged with Old Lyons and which would ultimately become Superior Bank. CTC proposed to invest $42.5 million in New Federal to acquire 100 percent of its common stock, with the capital for the acquisition to be funded by the Dworman and Pritzker Family Interests.

A December 27, 1988 Federal Home Loan Bank Board ("FHLBB") "S Memorandum" describes the proposed borrowings, which would take place in three "applications." In the first application, CTC proposed to incur $45 million of indebtedness, funded by NCNB National Bank, Charlotte, North Carolina. The collateral for $25 million of the indebtedness was to be contributed by Partners. The collateral included the following: (1) a first leasehold mortgage on the Hyatt Wilshire in Los Angeles; (2) a first lien security interest in all property owned by the borrower and used in connection with the Hyatt Wilshire; (3) a collateral assignment of the Hyatt Wilshire lease of the land and building to the Hyatt Corporation; and (4) a pledge of CTC stock by Partners.

UBH was to contribute the collateral for the remaining $20 million. The collateral included the following: (1) a first priority assignment of the lease to Lee National Corporation for a multi-residential/commercial project in San Francisco; (2) an assignment of Adco Folsom's net proceeds from condominium sales; and (3) a pledge of CTC stock by UBH. In return for their contributions, Partners and UBH were to receive stock in CTC.[2]

In the second application, Partners proposed to incur indebtedness of $1 million, funded by "the grandchildren of A.N. Pritzker." The loan proceeds were to be "downstreamed" to CTC as contributed capital.

In the third application, UBH proposed to incur indebtedness of up to $1.5 million, funded by Lee National Corporation, the owner of UBH. The loan proceeds were also to be "downstreamed" to CTC as contributed capital.

In December 1988, CTC acquired New Federal. At the time of CTC's acquisition of the thrift, Partners and UBH each owned half of CTC's stock. Superior became CTC's wholly owned subsidiary.

On December 30, 1988, FHLBB issued five resolutions concerning this transaction. Resolution No. 88–1552P approved the merger of Lyons into New Federal and CTC's acquisition of the thrift's stock. It also required CTC to enter into an "Assistance Agreement" (the "Agreement") and a "Voting and Disposition Rights/Dividend Agreement" (the "Voting Agreement") with FSLIC. It further required CTC, Partners, UBH, and CTC Trust to enter into a "Profit–Sharing Agreement" with FSLIC. Each of these documents was dated December 30, 1988.

The preamble to the Assistance Agreement states that it was entered into "by and among" CTC, New Federal, and the Federal Savings and Loan Insurance Corporation ("FSLIC"). These three entities were also the only signatories to the Agreement. Section 26 of the Agreement, entitled "Entire Agreement, Severability," states:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Stock Purchase

---

2. Plaintiffs claim that it was to achieve net tax benefits that Partners and UBH capitalized CTC with real estate instead of cash. They assert that, by using the tax losses the Federal Savings and Loan Insurance Corporation offered, CTC could sell the appreciated real estate properties from Partners and UBH, realize substantial capital gains, shelter those gains from tax, and return to Partners and UBH substantial value, thereby avoiding the tax that Partners and UBH would have had to pay if they had sold the properties and contributed the after-tax proceeds to CTC.

Agreement and any resolutions or letters concerning the Transaction or this Agreement issued by [FHLBB or FSLIC] in connection with the approval of the Transaction and this Agreement, *provided,* however, that in the event of any conflict, variance or inconsistency between this Agreement and the Stock Purchase Agreement or any other agreement entered into by [CTC] in connection with the Transaction, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations and liabilities of [FSLIC] are concerned.

(Paragraph designation omitted).

The Agreement also contains a "Sole Benefit" provision, section 29, which states:

It is the intention of the parties that this Agreement, the assumption of obligations and statements or responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

FSLIC's obligations under the Agreement were conditioned upon several things, including "[t]he capitalization of [New Federal] by [CTC] with cash in an amount equal to forty-two million, five hundred thousand dollars ($42,500,000)" and FSLIC's receipt of a copy of CTC's corporate resolutions authorizing the execution and delivery of the "Stock Purchase Agreement, this Agreement and any other agreements or instruments executed by [CTC] ...." § 2.

The preamble to the Profit–Sharing Agreement states that it was entered into "by and among" CTC, Partners, UBH, New Federal, and FSLIC. It also collectively refers to CTC, Partners, and UBH as the "Acquirers." In its "Recitals" section, it states that "a condition to the FSLIC's obligations under the Assistance Agreement is the execution of and continued compliance with this Agreement by the Acquirers."

Sections 1 and 2 of the Profit–Sharing Agreement mandate that, if a majority of any one of the parties' (New Federal, CTC, Partners, and UBH) stock was sold or transferred other than in the ordinary course of business, that party would have to transfer to FSLIC a pro rata share of any profits realized from the sale of "a majority of the outstanding shares of stock or partnership interests or substantially all of the assets" of New Superior, CTC, Partners, and UBH.

The preamble to the Voting Agreement states that it was entered into "by and between" CTC and FSLIC. The signatories thereto were CTC, New Federal, and FSLIC. Section IV of the Voting Agreement placed limits on the amount of payments or dividends that CTC could accept from New Federal.

During the term of the Agreement, CTC, as head of a consolidated group for tax purposes, filed tax returns that included its subsidiary, Superior Bank, within the consolidated group. Partners and UBH were not included within the consolidated group listed on CTC's tax returns.

## DISCUSSION

Defendant seeks to dismiss the tax benefit claims of UBH and Coast Partners on the grounds that those entities are not parties to any contract with the government, one implied term of which would be that the tax benefits flowing from this acquisition would not be targeted by the government for repeal. We agree.

It is well settled that "[o]nly plaintiffs who are in privity of contract with the government can have standing to bring a claim in this court." *Pacetti v. United States,* 50 Fed.Cl. 239, 244 (2001). Mere shareholder interest is insufficient to maintain a contract claim. *See First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed.Cir.1999); *Computer Prods. Int'l, Inc. v. United States,* 26 Cl.Ct. 518, 528 (1992); *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 696, 1980 WL 13154 (1980); *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 662, 428 F.2d 1241 (1970).

The only clear evidence of a contractual relationship between the United States, UBH, and Partners, is the Profit Sharing Agreement. Admittedly, the participation of UBH and Coast Partners in the assurances extracted by FSLIC were a condition to FSLIC entering into the Assistance Agreement with CTC and Superior Bank. However, unlike the circumstances present in similar cases, *see, e.g., Centex Corp. v. United States,* 52 Fed.Cl. 599 (2002); *First Heights Bank, FSB v. United States,* 53 Fed.Cl. 195 (2002), the negotiations leading to the acquisition here were not keyed in any respect to the ability of Superior and CTC to take advantage of combining tax returns with parent entities. Nor is there any hint of a quid pro quo relevant to tax benefits that would run to UBH and Coast Partners from approval of the acquisition. It was CTC that was obligated to contribute cash to the acquisition. It was CTC that was the parent entity for tax purposes. The parent entities here had no obligation to support the bank's capital compliance. Insofar as the tax benefit claim is concerned, they are no more than shareholders.

## CONCLUSION

UBH and Coast Partners were not parties to a contract with the United States with respect to the availability of tax benefits. Consequently, that aspect of their claim is dismissed.